Mr. Justice Hunt
delivered the opinion of the court:
The appellants presented their petition to the Court of Claims, asking to be allowed the value of fifty-six oxen, alleged to have been captured by a band of hostile Indians, and which were totally lost to them. The United States demurred to the claim as set forth, and the Court of Claims sustained the demurrer.
The claim was based upon the statute of 1849, entitled “An act to provide for the payment of horses and other property lost or destroyed in the military, service of the United States.”
A contract was entered into on the 25th day of July, 1864, between the United States quartermaster, Hodges, on the part of the United States, and Stuart, one of the claimants, of the other part. By the first article of the contract it was agreed that Stuart “should receive such military stores and supplies as may be offered or turned over to him for transportation, and to transport the same with all possible dispatch” between the points specified.
By the second, article it was agreed that Stuart should transport “ any number of pounds of military stores and supplies from and between one hundred thousand pounds and ten million pounds in the aggregate.”
The tenth article was as follows :
“Article X. That the said Andrew Stuart shall be furnished with a suitable escort for the protection of the supplies, should he be required to transport in any one train a less quantity than 125,000 pounds, but whenever required to transport 125,000 pounds, or more, then no escort shall be furnished.”
The petition alleges:
“That in the month of July, 1864, while Stuart was proceeding, in execution of said contract, with a train of wagons, from Fort Leavenworth, Kansas, to Fort Union, Hew Mexico Territory, the said train was, on the 12th day of July, 1864, in the vicinity of Oow Creek, Kansas, attacked by a band of hostile Indians, and without any fault or neglect on the part of the *67 claimants, or any of them, or of their agents, fifty-sis head of oxen, employed in moving said train, were captured by the said band of hostile Indians, and no part thereof has been recovered.” •
Three questions arise upon the case:
1. Was the capture of the property made “by an enemy,” within the meaning of the statute ?
2. Was the property, at the time of its capture, “in the military service of the United States % ”
3. Does the tenth section, above quoted, impose upon the owner the risk to which the property was exposed ?
So far as it may be necessary, these questions will be considered.
First. The allegations of the petition respecting the character, numbers, nation, or position of the capturing party are quite meager. It is said merely that the train “ was attacked by a band of hostile Indians,” and that the oxen “ were captured by the said band of hostile Indians.” A “ band” means a company of persons, perhaps a company of armed persons, as we may well assume to have been the case in this instance. We have no means of knowing how many persons composed this baud, what was their organization if any, or under what pretense, name, or authority they made the attack and capture. We know only that they were Indians, and that they were hostile. The fact that they were Indians gives no light. Many Indians, both in tribes and as individuals, were friendly to the United States in its late civil contest, as others were hostile. The Indian tribes and individuals are subject to the laws of the United States and of the States in which they are locate!, (The Cherokee Tobacco, 11 Wall., 619.) The claimants do not even state to whom or to what these Indians were hostile. They may have been hostile to the Government of the United States; they may have been hostile, inimical, or unfriendly to the owners of the cattle only. The hostility may have been •from the enmity of an organized community to the United States as a party engaged in war, or it may have been a hostility to the owners of cattle, because they had the cattle, and because the Indians desired the animals for their own use. In the one case the capture would have been that of an enemy, in the other that of marauders and plunderers only. The petition should have been more full and more specific in its state *68 ments. The law assumes that these deficiencies in it exist, because the petitioner could not with advantage to his case supply them.
Second. Was the property thus captured in the “ military service of the United States'?’’ By his contract of the 25th of July, 1864, did Stuart enter into the military service of the United States, and was he acting in such military service when his property -was captured, or was he a transporter, a carrier, a contractor merely? By the first article of his contract he undertakes “to transport” “ all such military stores or supplies as may be turned over to him for transportation ” from Forts Eiley and Leavenworth, and the town of Kansas, to New Mexico or Colorado. In the second, fourth, fifth, sixth, eighth, eleventh, twelfth, thirteenth, aud sixteenth articles the duty is clearly pointed out and named as that of transporting and delivering. A contractor or carrier is in no sense a soldier. In. no just sense is he engaged in war, although he may transport the articles used in war. He carries forth and he carries back (§ 13) supplies and stores for those who are engaged in war, but takes no personal part in it. He carries, in the present case, during the period between April and September, of the year 1864, from the points to the points named. There is no allegation that in the month of July, when the capture took place, actual war was going on in Kansas, or in the region between Kansas and New Mexico, or Colorado, or that the train from which the capture was made was a part of a military expedition. The stores, supplies, baggage-trains, the “impedimenta” of an army, are undoubtedly a portion of the army, and those engaged in the management and control of them are in the military service. These are indeed vital to its existence, and their collection and protection are among the most anxious duties of a careful commander.
But the collection and transportation from post to post of stores and supplies, remote from the seat of actual war, not forming a portion of an advancing or retreating army, is quite another thing. These latter duties are those of a^commissary or quartermaster, and not of a commanding officer. They may be performed by soldiers or by civilians, by the army or by contractors. Those engaged in them may or may not form a portion of an army.
That the statute of 1849, under which this claim is made, was *69 intended for the indemnity of those engaged in the actual military service of the United States, that is, for enlisted men while in the performance of their duties as such, is plain enough-(9 Stat. L., p. 414.)
Its first section provides for payment for horses killed or wounded in battle, or which shall have been injured or destroyed by dangers of the seas on a United States transport vessel, or which shall have been abandoned for want of forage by order of a superior officer, with certain provisions respecting deductions from future pay, which can only apply to enlisted men. The payment is limited by the words of this section to “ officers, volunteers, rangers, mounted militia-men, or cavalry engaged in.the military service of the United States.”
The second section of the act, under which the present claim is made, is as follows:
“That any person who has sustained, or shall sustain, damage by the capture or destruction by an enemy, or by the abandonment or destruction by the order of the commanding general, the commanding officer, or quartermaster, of any horse, mule, ox, wagon, cart, boat, sleigh, or harness, while such property was in the military service of the United States, either by im-pressment or contract, except in cases where the risk to which the property would be exposed was agreed to be incurred by the owner, and any person who has sustained, or shall sustain, damage by the death or abandonment and loss of any such horse, mule, or ox, while in the service aforesaid, in consequence of the failure on the part of the United States to furnish the same with sufficient forage, and any person who has lost, or shall lose, or has had, or shall have, destroyed, by unavoidable accident, any horse, mule, ox, wagon, cart, boat, sleigh, or harness, while such property was in the service aforesaid, shall be allowed and paid the value thereof at the time he entered the service: Provided, It shall appear that such loss, capture, abandonment, destruction, or death Avas without any fault or negligence on the part of the owner of the property, and while it was actually employed in the service of the United States.”
This section provides in its first clause for an indemnity for the loss of any horse, mule, ox, wagon, &c., arising from capture or destruction by an enemy, or where the property has been abandoned or destroyed by the order of a commanding officer, while such property was in the military service of the United *70 States, either by impressment or by contract. This military service is the same as that spoken of in the ñrst section, to wit: in battle, or service as soldiers under the command of officers of the army. The destruction, abandonment, or capture is that of the same enemy, to wit, an organized hostile force. And the same rule is applicable whether the property was in such actual service by the consent and agreement of the owner, as by hire, or whether it had been forcibly seized by the Government, that is to say, “ either by impressment or contract,” unless the owner had agreed himself to bear the hazard of the loss.
The next paragraph of the section provides for a loss by death or abandonment in consequence of failure on the part of the United States to supply sufficient forage, or where the loss has occurred “ by unavoidable accident” while such property “ was in the service aforesaid.” In each case the value of the article to be paid, is its value at the time such person “entered the service.” To all these provisos is added the final and sweeping qualification, in these words: “ Provided it shall appear that such loss, capture, abandonment, destruction, or death was without fault or negligence on the part of the owner of the property, and while it was actually employed in the service of the United States.”
Was the claimant personally in the service of the United States, and when did he enter it, if at all, and what were his duties'? It does not appear that he was obliged to be with the train in person, or even that he was with it at the time of the loss.
Upon the claimant’s construction of the statute, if his whole .train had been destroyed by lightning or by tempests, by unexpected drought or overwhelming heat, his claim for indemnity would have been perfect. A destruction, •“ by unavoidable accident,” of any horse, mule, ox, wagon, or cart, is provided for with equal clearness as where loss occurs by abandonment or by the capture of an enemy.
This construction is not admissible. The claimant was a carrier or transporter of stores or supplies for the United States, which stores and supplies were of a military character, and which would be used by the United States as their convenience or necessity required. He contracted to carry the stores, and the Government contracted to pay him $1.97 per hundred *71 pounds. He was not in the military service of the United States, and can, therefore, claim no benefit under the statute of 1819.
It is not perceived that the claimant’s caséis aided by the statute of 1863. (12 Stat. L., p. 743, § 5.) That statute enacts that the provisions of the act of 1849 shall be “ applicable to steamboats and other vessels, to railroad cars and engines, when destroyed under the circumstances provided fqr in the said act.” said act.”
We know, from the recent events of our history, that steamboats and railroad trains were actually and usefully employed as adjuncts of the Army, that they were used in military expeditions, and on some occasions that the trains were captured and destroyed by the enemy. These engines, both of war and of peace, when employed in tbe actual military service ofthe United States, are entitled to the same indemnity as the other property referred to.
The tenth article of the contract requires no discussion. It is quite immaterial in any view of the case.
The judgment of the Court of Claims is affirmed.