BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JACKSON, KANSAS, *v.* UNITED STATES.

No. 14. Argued October 16, 1939.—Decided December 18, 1939.

Mr. O. B. Eidson, with whom Mr. Thomas M. Lillard was on the brief, for petitioner.

*Mr. Raymond T. Nagle,* with whom *Solicitor General Jackson* and *Assistant Attorney General Littell* were on the brief, for the United States.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case is here to review an affirmance by the Circuit Court of Appeals for the Tenth Circuit of a ruling by

the District Court for the District of Kansas allowing interest in a suit for the recovery of taxes by the United States on behalf of an Indian under circumstances presently to be stated. 100 F. 2d 929. We granted *certiorari* because of conflicting views between the Ninth and the Tenth Circuits. See *United States* v. *Nez Perce County, Idaho,* 95 F. 2d 232.[1]

M-Ko-Quah-Wah is a full-blooded Pottawatomie Indian. In her behalf the United States asserts whatever rights she may have flowing from the Treaty of November 15, 1861, between the United States and the Pottawatomie nation of Indians, 12 Stat. 1191, and the legislation in aid of it. This Treaty made lands held by the United States in trust for the Pottawatomie Indians "exempt from levy, taxation, or sale . . .," "until otherwise provided by law. . . ." The land which gave rise to this controversy, situated in Jackson County, Kansas, was patented under the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U. S. C. § 348. In pursuance of this Act, the United States agreed to hold the land for twenty-five years under the restrictions of the 1861 Treaty, subject to extension at the President's discretion. Two ten-year extensions were made by Executive Order, one, in 1918 and the other in 1928; and by the Act of June 18, 1934, the existing trust periods were indefinitely extended by Congress. 48 Stat. 984.

In this legislative setting, the Secretary of the Interior in 1918, over the objection of M-Ko-Quah-Wah, cancelled her outstanding trust patent and in its place issued a fee simple patent. This was duly recorded in the Registry of Deeds for Jackson County. In consequence Jackson County in 1919 began to subject the land to its regular property taxes. It continued to do so as long as

---

[1] This case has since been followed by the same court in *United States* v. *Lewis County, Idaho,* 95 F. 2d 236, and *Glacier County, Mont.,* v. *United States,* 99 F. 2d 733.

this fee simple patent was left undisturbed by the United States. In 1927 Congress authorized the Secretary of the Interior to cancel fee simple patents theretofore issued over the objection of allottees. In 1935 the patent for the land in controversy was cancelled, and in the next year proceedings were begun by the United States as guardian of M-Ko-Quah-Wah to recover the taxes which Jackson County had collected, amounting to $1,966.13, with interest from the respective dates of payment. The District Court allowed interest at 6%, and a verdict for principal and interest, amounting to $3,277.49, was returned by the jury. A judgment upon this verdict was affirmed by the Circuit Court of Appeals. Jackson County does not here contest its liability for the principal, but challenges the Government's right to interest prior to judgment.

The issue is uncontrolled by any formal expression of the will of Congress. The United States urges that we must be indifferent to the law of the state pertaining to the recovery of taxes improperly levied on land within it. Jackson County, on the other hand, urges that the law of Kansas controls. It is settled doctrine there that a taxpayer may not recover from a county interest upon taxes wrongfully collected. *Jackson County* v. *Kaul*, 77 Kan. 715; 96 P. 45.

We deem neither the juristic theory urged by the Government nor that of Jackson County entirely appropriate for the solution of our problem. The starting point for relief in this case is the Treaty of 1861, exempting M-Ko-Quah-Wah's property from taxation. Effectuation of the exemption is, of course, entirely within Congressional control. But Congress has not specifically provided for the present contingency, that is, the nature and extent of relief in case loss is suffered through denial of exemption. It has left such remedial details to judicial implications. Since the origin of the right to be enforced is the Treaty, plainly whatever rule we fashion is ultimately.

attributable to the Constitution, treaties or statutes of the United States, and does not owe its authority to the law-making agencies of Kansas. Cf. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. And so the concrete problem is to determine the materials out of which the judicial rule regarding interest as an incident to the main remedy should be formulated. In ordinary suits where the Government seeks, as between itself and a private litigant, to enforce a money claim ultimately derived from a federal law, thus implying a wish of Congress to collect what it deemed fairly owing according to the traditional notions of Anglo-American law, this Court has chosen that rule as to interest which comports best with general notions of equity. *United States* v. *Sanborn,* 135 U. S. 271, 281; *Billings* v. *United States,* 232 U. S. 261. Instead of choosing a rigid rule, the Court has drawn upon those flexible considerations of equity which are established sources for judicial law-making.

But the present case introduces an important factor not present in former decisions. The litigation is not between the United States and a private litigant, but between the United States and the political subdivision of a state. In effect, therefore, we have another aspect of our task in adjusting the interests of two governments within the same territory.

Nothing that the state can do will be allowed to destroy the federal right which is to be vindicated; but in defining the extent of that right its relation to the operation of state laws is relevant. The state will not be allowed to invade the immunities of Indians, no matter how skilful its legal manipulations. *United States* v. *Rickert,* 188 U. S. 432. Cf. *Bunch* v. *Cole,* 263 U. S. 250. Nor are the federal courts restricted to the remedies available in state courts in enforcing such federal rights. *United States* v. *Osage County,* 251 U. S. 128; *Ward* v. *Love County,* 253 U. S. 17. Nor may the right to recover taxes

illegally collected from Indians be unduly circumscribed by state law. *Carpenter* v. *Shaw*, 280 U. S. 363. Again, state notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise. *United States* v. *Minnesota*, 270 U. S. 181. Cf. *Chesapeake & Delaware Canal Co.* v. *United States*, 250 U. S. 123. This is so because the immunity of the sovereign from these defenses is historic. Unless expressly waived, it is implied in all federal enactments.

But the recovery of interest in inter-governmental litigation has no such roots in history. Indeed, liability for interest is of relatively recent origin and the rationale of its recognition or denial is not always clear. That it is not a congenital rule in our law is indicated by its denial in *United States* v. *North Carolina*, 136 U. S. 211, on grounds of "public convenience." Since Congress has, in the legislation implementing the Indians' tax immunity, remained silent as to recovery of interest, we need not presume that it has impliedly fixed liability for interest in a suit like the present.

Having left the matter at large for judicial determination within the framework of familiar remedies equitable in their nature, see *Stone* v. *White*, 301 U. S. 532, 534, Congress has left us free to take into account appropriate considerations of "public convenience." Cf. *Virginian Ry. Co.* v. *Federation*, 300 U. S. 515, 552. Nothing seems to us more appropriate than due regard for local institutions and local interests. We are concerned with the interplay between the rights of Indians under federal guardianship and the local repercussion of those rights. Congress has not been heedless of the interests of the states in which Indian lands were situated, as reflected by their local laws. See, e. g., § 5 of the General Allotment Act of 1887, 24 Stat. 388, 389. With reference to other federal rights, the state law has been absorbed, as it were,

as the governing federal rule not because state law was the source of the right but because recognition of state interests was not deemed inconsistent with federal policy. See *Brown* v. *United States,* 263 U. S. 78; *Seaboard Air Line R. Co.* v. *United States,* 261 U. S. 299. In the absence of explicit legislative policy cutting across state interests, we draw upon a general principle that the beneficiaries of federal rights are not to have a privileged position over other aggrieved tax-payers in their relation with the states or their political subdivisions. To respect the law of interest prevailing in Kansas in no wise impinges upon the exemption which the Treaty of 1861 has commanded Kansas to respect and the federal courts to vindicate.

Assuming, however, that the law as to interest in governmental actions based upon quasi-contractual obligations be applicable, the United States must fail here. The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable. *United States* v. *Sanborn,* 135 U. S. 271, 281; *Billings* v. *United States,* 232 U. S. 261.

Jackson County in all innocence acted in reliance on a fee patent given under the hand of the President of the United States. Even after Congress in 1927 authorized the Secretary of the Interior to cancel such a patent, it was not until 1935 that such cancellation was made. Here is a long, unexcused delay in the assertion of a right for which Jackson County should not be penalized. By virtue of the most authoritative semblance of legitimacy under national law, the land of M-Ko-Quah-Wah and the lands of other Indians had become part of the economy of Jackson County. For eight years after Congress had directed attention to the problem, those specially entrusted with the intricacies of Indian law did not

call Jackson County's action into question. Whatever may be her unfortunate duty to restore the taxes which she had every practical justification for collecting at the time, no claim of fairness calls upon her also to pay interest for the use of the money which she could not have known was not properly hers.

Such is this Court's doctrine regarding the imposition of interest in cases where this Court has fashioned its own doctrine. If it be said that the default of the United States should not be charged against its Indian wards, a choice has to be made between equally innocent victims of official neglect from 1918 until 1936 in the administration of the Indian law. The loss of interest to the United States because of the conduct of its officials in the *Sanborn* and *Billings* cases, *supra,* had to be borne by the innocent public. We think as to interest here, the loss should remain where it has fallen. If thereby Indians are out of pocket, they should not be made whole by putting Jackson County unfairly out of pocket. The appeal for relief must be made elsewhere.

The judgment below must accordingly be modified, and the case is remanded for further proceedings in accordance with this opinion.

*Judgment modified.*

MR. JUSTICE McREYNOLDS concurs in the result.

Opinion of MR. JUSTICE BLACK.

Congress has traditionally treated the Indian wards of the Nation with particular solicitude,[1] but has also gradually evolved a policy looking to their eventual absorption into the general body of citizenry.[2] This policy has

---

[1] *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 564–6, 568; *United States* v. *Pelican,* 232 U. S. 442, 450.

[2] *Chippewa Indians* v. *United States,* 307 U. S. 1, 4; see *Stuart* v. *United States,* 18 Wall. 84, 87; *Matter of Heff,* 197 U. S. 488, 497–503; *Lane* v. *Mickadiet,* 241 U. S. 201, 210; *Dickson* v. *Luck Land Co.,* 242 U. S. 371, 375; *McCurdy* v. *United States,* 246 U. S. 263, 269.

progressively subjected Indians to the laws under which all other citizens must live in the Indians' States of residence, if not in conflict with specific protective measures of Congress.[3]  Here, in the exercise of its plenary authority, Congress by treaty exempted the lands of the Pottawatomies from taxation.  It could have by stipulation granted the additional right to recover interest on any taxes collected in violation of the exemption; but it did not.  The failure of Congress to stipulate that a State—as here—must pay interest to an Indian when the State law permits interest to no one,[4] is entirely consistent with the congressional policy of steadily extending the operation of the States' laws over their resident Indians.  Congress—with exclusive plenary power to legislate concerning the Indians—has not provided for recovery of interest from Kansas, and the courts have no constitutional power to create the right.

That Congress contented itself with the creation of the right to be free from taxation—as distinguished from a right to interest in a suit for refund—is emphasized by the conclusion which would be inescapable were this a suit against the United States for violation of the exemption here conceded to be binding on it.[5]  Without more,[6] Congress would then—even on the basis of this concession—be deemed to have refused to create the separate right to recover interest.[7]

[3] See Matter of Heff, supra; La Motte v. United States, 254 U. S. 570, 579, 580; Sperry Oil Co. v. Chisholm, 264 U. S. 488, 498; Larkin v. Paugh, 276 U. S. 431, 438–9; United States v. McGowan, 302 U. S. 535, 539.

[4] Jackson County v. Kaul, 77 Kan. 717; 96 P. 45.

[5] The Government bases its concession on Choate v. Trapp, 224 U. S. 665.  But see The Cherokee Tobacco, 11 Wall. 616; Ward v. Race Horse, 163 U. S. 504, 511; Lone Wolf v. Hitchcock, supra, 566.

[6] Cf. 26 U. S. C. 1671 (a).

[7] Angarica v. Bayard, 127 U. S. 251, 260; United States v. North American Co., 253 U. S. 330, 336; Smythe v. United States, 302 U. S. 329. 353.  Cf. United States v. North Carolina, 136 U. S. 211.

Because the laws of Kansas deny interest on tax refunds, I concur in the modification of the judgment below.[8]

MR. JUSTICE DOUGLAS concurs in this opinion.

---

[8] Cf. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64.