194 F.2d 1016
 WILSON & CO., Inc.
v.
RECONSTRUCTION FINANCE CORPORATION.
 No. 576.
 United States Emergency Court of Appeals
 Heard at Chicago January 14, 1952.
 Decided March 11, 1952.
 
 Louis R. Simpson, Chicago, Ill., for complainant.
 George Arthur Fruit, Attorney, Department of Justice, Washington, D. C., with whom J. Gregory Bruce, Attorney, Department of Justice, Washington, D. C., was on the brief, for respondent.
 Before MAGRUDER, McALLISTER and LINDLEY, Judges.
 LINDLEY, Judge.
 
 
 1
 By this action, brought pursuant to Section 204(a) of the Emergency Price Control Act, of 1942, as amended, 50 U.S.C.A. Appendix, § 924(a), complainant challenges the validity of a claim receivable assessed by respondent against complainant, growing out of the so-called "recapture program" instituted by respondent's Announcement No. 1, under R.F.C.Rev.Reg.No.10. The validity of that announcement is not questioned, complainant conceding that this court's decision in Wm. Schluderberg-T. J. Kurdle Co. v. R. F. C., Em.App., 169 F.2d 419, certiorari denied 335 U.S. 846, 69 S.Ct. 68, 93 L.Ed. 396, has settled that issue. However, complainant alleges that respondent's interpretation and application of the announcement, with respect to complainant's operations, has resulted in an "arbitrary and capricious" order establishing the sum of $167,529.27 as the amount due respondent.[1] In addition complainant insists that, even though we sustain recapture of the principal amount, respondent had no right to assess interest thereon.
 
 
 2
 The general plan and underlying purpose behind Announcement No. 1 were considered by this court in the Schluderberg-Kurdle case, supra. What was said there is of equal applicability here. However, for the purpose of clarifying the issues here, a brief restatement of some of those considerations may be helpful.
 
 
 3
 On June 30, 1946, the Emergency Price Control Act of 1942, as amended, expired by its own terms. With the resultant cessation of ceiling prices on sales of meat and meat products, the meat subsidy program administered by respondent and its predecessor, Defense Supplies Corporation, was terminated. During July and August 1946 unsubsidized meat was sold at uncontrolled prices. On July 25, 1946, Congress enacted the Price Control Extension Act of 1946, 60 Stat. 664, 15 U.S.C.A. § 713 note. Pursuant to this Act ceiling prices on sales of meat were reimposed September 1, 1946. 11 Fed.Reg. 9372. Simultaneously respondent revived the meat subsidy program. 11 Fed. Reg. 9375. On October 14, 1946, price controls were again suspended by administrative order. 11 Fed.Reg. 12093. So too, was the subsidy program.
 
 
 4
 On March 31, 1947, respondent issued Announcement No. 1 which provided that subsidy payments "allocable" to a slaughterer's terminal inventory (i. e., his inventory as of 12:01 A.M. October 15, 1946) were to be "recaptured" — i. e., repaid to respondent. The purposes inspiring this action were, 1) to avoid unjust enrichment of slaughterers, as the meat then held was subsequently disposed of at uncontrolled prices, and 2) to comply with the provisions of Section 6(a)(4) of the 1946 Act. In the Schluderberg-Kurdle case, we were primarily concerned with the latter, concluding that it was decisive of the validity of Announcement No. 1. Section 6(a) (4) of the Act provided that subsidy payments should not be made "with respect to any commodity for any period occurring after the date of the enactment of this Act during which maximum prices on such commodity are not in effect". We determined that, while subsidy payments were made on the basis of slaughter, they were intended to compensate the slaughterer for the "squeeze" between purchase price and controlled selling price, and thus were a supplement to his selling price. Consequently, if the slaughterer were allowed to retain the payments allocable to his terminal inventory subsequently sold at uncontrolled prices, payments would in effect be made for a period "during which maximum prices * * * [were] not in effect", contrary to the terms of the Act.
 
 
 5
 Complainant's operations during the period September 1 through October 14, 1946 can be best illustrated by the following chart.
 
 
 6
 PORK

 Equivalent
 Carcass Wt.

 Opening inventory September
 1, 1946 ................... 15,293,900 lbs.
 Carcass weight of hogs
 slaughtered Sept. 1-October
 14, 1946 (subsidized) ..... 5,618,900
 Purchases of pork and pork
 products from outside
 sources during same period 166,600
 __________
 21,079,400
 Less: sales of pork and
 pork products during
 same period ............... 14,594,600
 __________
 TERMINAL INVENTORY ......... 6,484,800 lbs.
 ===============

 BEEF

 Opening inventory September
 1, 1946 ................... 5,453,500 lbs.
 Carcass weight of cattle
 slaughtered Sept. 1-October
 14, 1946 (subsidized) ..... 3,983,700
 Carcass weight of cattle
 slaughtered during same
 period (unsubsidized) ..... 289,800
 Purchases of beef and beef
 products from outside
 sources during same period 258,200
 __________
 9,985,200
 Less: sales of beef and beef
 products during same period 7,531,900
 __________
 TERMINAL INVENTORY ......... 2,453,300 lbs.
 ===============
 
 
 7
 Following promulgation of Announcement No. 1, respondent sought to recapture the amount of subsidy payments "allocable" to complainant's terminal inventories, limiting the claim in the case of hogs to the amount of subsidies actually paid during the September 1-October 14 period.[2] A dispute arose between complainant and respondent as to the application of the announcement. Complainant asserted that recapture based on these terminal inventories was erroneous for two reasons: 1) subsidies were intended to prevent the "squeeze" between the purchase price and the controlled selling price of meat, and complainant's sales for the period September 1-October 14 had far exceeded its subsidized slaughter; 2) due to complainant's customary use of the last-in-first-out method of cost accounting no subsidies could properly be deemed "allocable" to its terminal inventories. Respondent disagreed; however, it did accede to the extent that it allowed credit for any meat in the terminal inventory which could be identified as having been produced during the subsidy free period of July and August 1946. Complainant accepted this concession subject to its previously stated objections, and filed proofs which established that certain portions of the terminal inventory had been produced during the subsidy free period. Respondent accepted the proof submitted, deducting the subsidies allocable thereto from the original claim receivable, thus arriving at a net amount due from complainant equal to the sum here in controversy.
 
 
 8
 In its complaint complainant asserts the aforementioned objections as grounds for the invalidation of respondent's order. The initial assertion is allegedly premised on the purpose of the meat subsidy program. As this court said in the Schluderberg-Kurdle case, supra, 169 F.2d at page 422, "the subsidy program was instituted, and maintained, to compensate the producers of meat for the `squeeze' between livestock prices and the maximum prices at which they were permitted to sell their meat products. See Rubin v. Bowles, Em.App.1945, 150 F.2d 860, 861; 89 Cong. Rec. 6495." From this statement complainant argues that subsidies cannot properly be recaptured from it because its sales during the period September 1-October 14 exceeded its authorized and subsidized slaughter for both hogs and cattle. Consequently, complainant insists, it was not fully compensated for the "squeeze" during that period. This was the identical argument advanced by Schluderberg-Kurdle Co. in the cited case. The sales in excess of subsidized slaughter by the present complainant were the result of extensive inventories on hand at the time of reimposition of price controls and meat subsidies. So too with Schluderberg-Kurdle Co. "But the regulations reimposing such maximum prices postponed the effective dates thereof for a week or more so as to enable slaughterers to dispose of unsubsidized inventories at uncontrolled prices. Whether the period allowed was adequate for this purpose might conceivably have a bearing upon the validity of such reimposed maximum prices; but we are not now concerned with that matter, * * *." Schluderberg-Kurdle Co. v. R. F. C., supra, 169 F.2d at page 423. This language is completely determinative of complainant's like assertion here.
 
 
 9
 Complainant next insists that subsidies were not properly "allocable" to its terminal inventory because it employs, for income tax purposes, the last-in-first-out method of cost accounting. This accounting theory adheres to the proposition that, in determining the cost of goods sold during a given period of time, goods last acquired or manufactured will be regarded as the first sold. Complainant seeks to extend this cost concept to the actual flow of meat through its slaughtering operations. Thus it contends that, due to the fact that its sales during September 1-October 14 exceeded its production, and by its accounting theory the meat last produced is viewed as the first sold, the terminal inventory must be composed of meat first acquired i. e., the meat on hand as of September 1, 1946. Hence, this meat not having been produced during September 1-October 14, no subsidies for that period can be deemed "allocable" to it. Respondent rejected complainant's application of the last-in-first-out theory to the recapture program, stating that it did "not afford a fair or proper basis for approaching inventory recapture." It is apparent that respondent took the position that meat in complainant's terminal inventory had prima facie been produced during the last subsidy period, and that such an application of Announcement No. 1 could be avoided only upon an affirmative showing that meat held as of October 15, 1946 had in fact been produced during the subsidy free period of July and August 1946.
 
 
 10
 Certainly such an application of the announcement is not "arbitrary or capricious" on its face. See Flour Mills of America v. R. F. C., Em.App., 179 F.2d 965. Thus all that remains is to determine whether respondent's rejection of complainant's accounting theory as affirmative proof was "arbitrary or capricious." Again complainant alludes to the purpose of the meat subsidy program in support of last-in-first-out, asserting that this method of accounting best depicts the "squeeze" effected by its sales in excess of subsidized slaughter during September 1-October 14. Assuming, arguendo, that this accounting practice does produce a more accurate reflection of complainant's operations during that period, again the answer lies in complainant's opportunity to dispose of its September 1 inventory at uncontrolled prices. Thus, the crux of the problem is — does the last-in-first-out system constitute affirmative proof that the terminal inventory was produced prior to September 1, 1946? As stated, this method of accounting concerns itself with a determination of cost of goods sold; not with the actual flow of production. Regardless of the date of acquisition or production of the goods sold, the cost of those last acquired is employed to determine profits. A simple example is illustrative.
 
 
 11
 During the month of January the XYZ Hardware Co. purchases two drums of kerosene; Drum No. 1 on January 5; Drum No. 2 on January 15. The cost of No. 1 is $5.00; of No. 2 $10.00. During the same month total sales of kerosene consume only the contents of Drum No. 1. In drawing up a profit and loss statement for January, if the last-in-first-out method of accounting is employed, the cost of the kerosene sold will be reported as $10.00. This is true despite the fact that the actual flow of goods through the store was on a first-in-first-out basis.
 
 
 12
 Thus it is evident that the last-in-first-out method per se offers no proof whatsoever as to the actual date of slaughter of the component parts of complainant's terminal inventory. Consequently it cannot be said that respondent's rejection of such proof was "arbitrary or capricious." By the terms of the Act of 1946 respondent was under a duty not to pay subsidies on meat subsequently sold at uncontrolled prices. For purposes of administrative expediency, respondent took the position that all terminal inventories were subject to recapture, absent proof to the contrary. Complainant, having failed to supply that proof, cannot be heard to say that the claim receivable assessed against it was "arbitrary or capricious."
 
 
 13
 In its protest filed December 14, 1950, complainant did not specifically object to imposition of interest. Indeed, it could not have done so, as interest had not at that time been assessed; in fact, no final order had been entered. Respondent had provided by Reg. 11, that all protests should be filed by December 15, 1950.[3] Consequently, complainant, desirous that this limitation should not bar all right to relief, filed its protest before the time expired and, necessarily before the order was entered against "any final order or determination hereafter made" denying any of "its basic claims" for subsidies on livestock slaughtered during September and October, 1946, in whole or in part, and against any order settling the controversy between the parties in any manner other than that previosuly urged by complainant. We think that complainant had a right to protest before the order was entered rather than to be forced to take a chance on waiting until the order had been entered and then be confronted by respondent's assertion that any right to protest was barred by its regulation. And, inasmuch as it could not know just what the order would provide, it could protest only generally to the effect that, if not in accord with its claim of what was right and proper, then its objections would apply. We think complainant should not have been compelled to gamble on the invalidity of Regulation 11, but that, in view of that regulation, it had a right to protest and to have considered and determined, as a part of its protest, any pertinent objection to all parts of such order. At any rate we prefer to consider the objection to the imposition of interest upon its merits.
 
 
 14
 Treating the protest, then, as one embracing objections to all phases of such order as respondent might thereafter enter, as we think it should be, in view of the impelling necessity upon complainant to file its protest before the final date fixed by respondent, there arises the further question of whether, upon its merits, the objection to the inclusion of interest in the order to repay over-payments for subsidies is well founded. We keep in mind that the chief purpose of the plan was to assure the production of meat essential to the national economy. This result could be best achieved, it was believed, by compensating slaughterers for the squeeze placed upon them by the difference between the prices they paid for livestock under the Act and the inadequate prices at which they were permitted to sell the meat under O.P.A. ceiling prices.
 
 
 15
 Inasmuch as slaughterers might be compelled to wait for long periods of time for their subsidies, if claims therefor had to be examined, checked, audited and verified before payment, the policy was adopted of making preliminary immediate advancements, if the claims appeared prima facie correct, subject to subsequent audit and verification. In the absence of such plan of procedure, slaughterers would have been compelled frequently to do without payment for many months. This policy, adopted for the convenience of the packing industry, was outlined in Section 5(d) of Livestock Slaughter payments Regulations No. 3 issued September 18, 1943.[4]
 
 
 16
 It is obvious that no one could determine until final audit whether any part of a subsidy payment was unjustified. If, upon such audit, some portion of a subsidy claim found improper was ordered repaid, then it is apparent, to the extent of the over-payment, the slaughterer had wrongfully received payment. He had enjoyed the use of the money represented by the over-payment, without right thereto, for which, in good faith, he was bound to account. That he should pay interest for the enjoyment and use of moneys to which he was not entitled, seems sound to us both legally and equitably. When complainant accepted prompt subsidy payments upon claims, the figures of which were accepted by the government as prima facie sufficient, it well knew of, and must be held to have assented to, the provisions of, Section 5 (d). By acceptance of payments, it tacitly agreed to repay such sums as were subsequently found to have been excessive, i. e., wrongfully received. From such circumstances, we think, arises an implied agreement to pay interest for the use and enjoyment of the wrongful or mistaken overpayment.
 
 
 17
 Whether interest accrues upon a debt due the United States is to be determined ultimately from the federal law; Board of Com'rs of Jackson County v. U. S., 308 U.S. 343 at page 350, 60 S.Ct. 285 at page 288, 84 L.Ed. 313; U. S. v. Billings, 232 U.S. 261 at page 286 and 288, 34 S.Ct. 421, 58 L.Ed. 596; "the rule governing the interest to be recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable federal statute it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for non-payment of the amount found to be due." Royal Indemnity Co. v. U. S., 313 U.S. 289 at page 296, 61 S.Ct. 995 at page 997, 85 L.Ed. 1361. In suits where the government seeks to recover from a private litigant, the court will adopt the rule which "comports best with general notions of equity. * * * The cases teach that interest is * * * given in response to considerations of fairness. It is denied when its exaction would be inequitable." Such is the Supreme Court's "doctrine regarding the imposition of interest in cases where" the court "has fashioned its own doctrine." Board of Com'rs. v. U. S., supra; National Home for Disabled Volunteer Soldiers v. Parrish, 229 U.S. 494 at page 497, 33 S.Ct. 944, 57 L.Ed. 1296.
 
 
 18
 Though respondent adopted no regulation specifically fixing liability for interest, it made repeated announcements of its policy in this respect. In Bulletin 176, June 14, 1944, it said to its representatives: "Generally it is the policy of Defense Supplies Corporation to collect interest where money has been paid out to applicants who are not entitled to it, from the date of payment to the date of repayment at 4%." In Bulletin 203, Dec. 30, 1944, it instructed its agents to advise packers against whom claims receivable for overpayments existed that: "interest will run at 4% from date of disbursement," and included specific instructions as to interest. In Bulletin 273, Dec. 1, 1947, respondent proclaimed its policy as to interest upon recapture receivables thus: "Inventory recapture receivables will bear interest at 4% per annum from January 1, 1948".
 
 
 19
 From the beginning respondent demanded and collected from all slaughterers who were determined to have received over-payments in subsidies, interest upon such over-payments. This practice, according to the testimony, was generally known to slaughterers. It was followed with reference to a claim receivable against complainant itself for both principal and interest imposed in September 1946 and collected in October 1946. Thus, it is clear that complainant was fully aware of the practice and acceded without complaint to its application in this prior transaction with respondent.
 
 
 20
 The situation is the same, we think, as it would have been had respondent adopted a regulation expressly providing for recovery of interest. In other words, if respondent could promulgate such a regulation, it could with equal authority, enter an order imposing interest. If a regulation would have been valid, so too were the orders to the same effect. In U. S. v. Philmac Mfg. Co., 3 Cir., 192 F.2d 517, the court was called upon to decide whether a regulation imposing interest upon sums found due the government upon renegotiation proceedings was valid. The court held in the affirmative, saying 192 F.2d at page 519, "Was this regulation valid? Our view is that it was. That interest may be recovered on money due the government even in unilaterally determined liability is well recognized. Likewise, it has seemed pretty clear to courts handling cases arising under the Renegotiation statutes that one of the objectives to be attained was prompt collection from those who owed the government money."
 
 
 21
 That situation is closely akin to the one before us. In one, over-payments upon contracts were in question; in the other, over-payments on subsidies. But in both instances, in the first by regulation, in the second by a declared policy, known to complainant and previously acceded to by it, the question was as to the power of the governmental agency to impose and collect interest. Complainant, enjoying the use of the over-payments from the time of their receipt, ought legally and equitably to comply with the contract implied from its participation in the subsidy program to make whole the government, who, for the slaughterer's own convenience, has made the advancements later found to be excessive. The date fixed, Jan. 1, 1948, and the rate applied are not beyond the administrative discretion of respondent.
 
 
 22
 Complainant's insistence that interest never accrues until the principal has been liquidated is we think refuted by the language of Funkhouser v. Preston Co., Inc., 290 U.S. 163, 168-169, 54 S.Ct. 134, 136, 78 L.Ed. 243 as follows: "It has been recognized that a distinction, in this respect, simply as between cases of liquidated and unliquidated damages, is not a sound one. Whether the case is of the one class or the other, the injured party has suffered a loss which may be regarded as not fully compensated if he is confined to the amount found to be recoverable as of the time of breach and nothing is added for the delay in obtaining the award of damages. Because of this fact, the rule with respect to unliquidated claims has been in evolution (Faber v. New York, supra [222 N.Y. 255, 118 N.E. 609]), and in the absence of legislation the courts have dealt with the question of allowing interest according to their conception of the demands of justice and practicality. Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 69 L.Ed. 265. `The disinclination to allow interest on claim of uncertain amount seems based on practice rather than theoretical grounds.' Williston on Contracts, vol. 3, § 1413."
 
 
 23
 This is also, we think, complete answer to complainant's argument that Southern Pac. R. Co. v. U. S., 228 U.S. 618, 33 S.Ct. 717, 57 L.Ed. 993, bars recovery of interest here. What is said there as to the necessity of liquidation must be read in the light of the later announcements of the Supreme Court in such cases as Funkhouser v. Preston Co., supra. Furthermore, as we read the Southern Pacific case, the court was largely impelled to hold that to allow the claim under the facts of that case would be inherently unfair and beyond the discretion of the court because of the long protracted delay and apparent acquiescence of the government in the existing status. The facts here are far removed from any such circumstances. Indeed respondent, in its attempt to treat slaughterers fairly, informed them that because of delay in putting the inventory recapture plan into operation, interest would be charged only from January 1, 1948 rather than from the date of over-payment in 1946. We conclude that the imposition of interest at the rate and for the limited period fixed was legally sound and well within respondent's administrative discretion.
 
 
 24
 Judgment will enter dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 The amount fixed by respondent's denial of protest was $194,537.49. Deducted from this was a credit of $27,008.22 arising out of unpaid subsidies owed complainant. The net sum of $167,529.27 consists of $146,977.84 principal and $20,551.43 interest at a rate of 4% from January 1, 1948 to July 1, 1951. Interest at the same rate is being charged until payment
 
 
 [2]
 Complainant's terminal inventory of hogs was 6,484,800 pounds. Its subsidized slaughter of hogs during September 1-October 14 was only 5,618,900. Thus respondent sought recapture of the subsidies allocable to the latter of these amounts
 
 
 [3]
 The validity of this order is not in issue here
 
 
 [4]
 "Terms of Payment. Payments will be made monthly upon preliminary approval of the claim. Preliminary approval and payment of claims shall not constitute final acceptance of the validity or amount of the claim. On a finding that the claim is invalid or defective Defense Supplies Corporation shall have the right to require restitution of any payment or any part thereof. Any sums found to be due to Defense Supplies Corporation shall be deductible against any accrued or subsequent claim for any payment by Defense Supplies Corporation to the person." (8 F.R. 10826)