**UNITED STATES**

v.

**TURLOCK DEHYDRATING & PACK-ING CO. et al.**

**No. 6494.**

United States District Court
N. D. California, N. D.

Sept. 9, 1953.

Wm. L. Lally, Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Albert E. Sheets, Sacramento, Cal., for defendants.

LEMMON, District Judge.

When the United States, through its Food and Drug Administration, condemned the raisins that had been subsidized by the Government-owned Commodity Credit Corporation, it was acting in a sovereign and not in a so-called "proprietary" capacity.

In seizing the "moldy", "rotten", and "insect-damaged" dried fruit, the Federal agents were protecting the health of the people, literally to—

> "Let them not lick
> The sweet which is their poison." [1]

Accordingly, the plaintiff's rights herein are not to be measured by the standards of the market place.

### 1. The Complaint

The complaint was filed on May 4, 1951. Its salient allegations follow:

This action is based on a claim of the Commodity Credit Corporation, hereinafter referred to as "Commodity", over which jurisdiction is conferred on this Court by 15 U.S.C.A. § 714b(c).

Commodity, the Federal chartered corporation, is the successor of a State-chartered corporation of the same name, organized under the laws of Delaware. The claims of the Delaware corporation have been transferred to Commodity by virtue of 15 U.S.C.A. § 714n. The references to Commodity in the complaint are to the Delaware corporation.

The defendants are residents of Turlock, Stanislaus County, California.

The purpose of this action is to recover subsidy payments obtained by the defendants from Commodity in excess of the amount properly due them.

On September 1, 1945, Commodity entered into a "1945 Processed Raisin Agreement" with the defendants, as follows: Commodity agreed, subject to certain conditions, to purchase processed raisins of the 1945 crop from the defendants and immediately to resell them to the defendants at a lower price, thereby effecting a subsidy to the defendants. The purpose of the subsidy was to assure an adequate supply of standard quality processed raisins of the 1945 crop for the need of Government agencies and for civilian consumption, and to assure the proper and orderly marketing thereof within OPA maximum ceiling prices.

Section 3 of the Agreement required that, in the case of all sales of processed raisins by the defendants to Commodity, the defendants, in order to obtain the subsidy thereon, should describe the grade, type, quality, and packaging of the processed raisins so sold, and war-

---

1. Coriolanus III i 156–157.

rant that they were of standard quality of the grade, type and packaging described.

Section 1 of the Agreement defined "standard quality raisins" as prepared from properly matured fruit, and as being clean, sound, and well dried and cured.

Section 8 provided that payments made under the agreement would be subject to audit by Commodity, and that any overpayments should be refunded by the defendants to Commodity.

The defendants filed three applications for settlement with Commodity—on November 9, 1945, December 12, 1945, and February 1, 1946—covering that portion of their 1945 pack of processed raisins which was sold to the civilian trade. On the basis of such applications the defendants received payments from Commodity.

After such payments had been made, it was discovered by Commodity that five lots of raisins, totaling 89.34 tons, which had been included in the applications for settlement, had been seized by the Federal Food and Drug Administration, hereinafter referred to as "Food and Drug", on or about January 15 and 21, 1946, March 13, 1946, and May 10, 1946.

The seizures were on the ground of adulteration within the meaning of Section 402(a) (3) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 342(a) (3), "since the raisins consisted in whole or in part of a decomposed substance by reason of the presence of moldy and rotten raisins."

"As a result of such seizures", Commodity overpaid the defendants $7,651.-61 in subsidy on processed raisins sold in civilian channels, which raisins were not of standard quality, as required by Section 3 of the Agreement, supra.

As a second count, the plaintiff alleges that after payments had been made to the defendants by Commodity, it was discovered by audit that the defendants had been overpaid subsidy in the amount of $71.67 on certain quantities of proc-

essed raisins not actually shipped to civilian purchasers, and on which the defendants had issued credits to such purchasers to adjust for such shortages in shipment.

The plaintiff demands judgment against the defendants jointly and severally for $7,723.28, together with interest and costs.

## 2. The Answer

The answer, filed on December 17, 1952, sets forth that the complaint fails to state a claim against either defendant upon which relief can be granted; that the claim is barred by Sections 338, subd. 4, and 337, subd. 1, of the California Code of Civil Procedure, and by 15 U.S.C.A. § 714b(c); and that the complaint should be dismissed for failure to serve the summons and a copy of the complaint within a reasonable time after the filing of the action, and because of the plaintiff's failure to prosecute the action with due diligence.

It is further objected that prior to the filing of this action, the parties made a complete settlement of accounts, which were audited by Commodity and accepted, and that there are therefore no sums due from the defendants to the plaintiff.

The answer also raises the defense of laches, alleging that the plaintiff delayed for five and one-half years in asserting its causes of action, and delayed eighteen months longer in attending to the service of process, "thereby prejudicing defendants through accumulation of interest," etc.

The defendants admit that they entered into the Agreement, supra, but deny that the purpose of the action is to recover excessive subsidy payments, "that any subsidy was paid to defendants thereunder", and that the purpose of the subsidy was as set forth in the complaint, supra. They also deny the accuracy of the plaintiff's summary of Sections 1, 3 and 8 of the Agreement.

It is admitted that the defendants filed the three applications for settlement, and that the seizures alleged by the plaintiff were made. The defendants deny, how-

ever, all the other allegations regarding the seizures or the alleged overpayments resulting therefrom.

The answer contends that the consideration paid by the defendants in the sale by them to Commodity of 89.34 tons of raisins under the Agreement was "a subsidy of approximately $85.99 per ton to producers plus the 89.34 tons of raisins and plaintiff has not tendered back or paid to defendants any part of said consideration".

It is further claimed that neither the plaintiff nor Commodity has suffered any damage, and that neither gave notice of the claimed breach of warranty by the defendants within a reasonable time after Commodity accepted the raisins sold to it.

With regard to the second count of the complaint, supra, the answer admits and denies, as before, certain allegations of the first count that are incorporated into the second count. As to one such allegation, relating to the three applications for settlement, however, which were admitted as to the First Count, for some unexplained reason a denial has been entered in the answer to the second count. No doubt this is an inadvertence.

The defendants deny the salient allegations of the second count; namely, that the defendants were overpaid subsidy in the amount of $71.67, etc., supra.

### 3. The Defendants' Various Motions

A motion to quash the service of the summons was denied on November 26, 1952. At that time, the Court announced that ruling upon a motion to dismiss filed by the defendants would be continued to the trial of the case, observing that it "would then be in a better position to determine whether defendants have suffered prejudice as the result of the delay in the service of the summons", supra.

At the trial, held on May 12, 1953, the Court denied a motion to amend the complaint, and also denied the motion to dismiss.

### 4. The Crucial Sections of the Contract

Although the answer implies a criticism of the summary of Sections 1, 3 and 8 which is given in the complaint, supra, so far as the purposes of the present case are concerned that summary is adequate.

In addition, it should be pointed out that the transactions here being considered took place under Section 5 of the Agreement, the text of which follows in part:

"*Section 5. Civilian portion.* To the extent that sales of processed raisins to purchasers other than Government agencies are permitted by applicable regulations and orders of the United States Department of Agriculture (such purchasers being hereinafter called 'Civilian Purchasers'), Packer (the defendants) shall proceed with the normal distribution and sale of such raisins to such Civilian Purchasers. Immediately prior to each such sale to Civilian Purchasers * * * made on or before September 30, 1946, of processed raisins * * *, Commodity shall purchase such raisins, as aforesaid, from Packer, pursuant to Section 3 hereof, at the applicable Commodity Purchase Price, and immediately thereafter, shall sell such raisins to Packer at the applicable Commodity Sale Price. Each such sale by Commodity shall be without warranty by, or recourse against, Commodity."

### 5. The Seizures and the Tests

As we have seen, the defendants admit that the seizures of the raisins were made. The goods were shipped on October 26, 1945, November 11, 1945, December 12, 1945, and January 11, 1946. The raisins were held in storage until about May, 1946. The defendants were notified of the seizure in a letter dated August 1, 1946, sent by the Western Marketing Field Office of the Department of Agriculture at Berkeley, California.

The Court has carefully studied the many reports on these raisins made by Food and Drug. The story that these reports tell is not a pretty one.

The samples were taken from cartons, bags and cases.

Sample No. 12601–H was tested at Boston, the date of the "sample summary" being December 10, 1945. "Conclusions and recommendation: The raisins are excessively moldy and sandy. *An average of 54% were moldy.*" The Microbiology station found a "total average of 23.6% moldy," with one dead beetle larva in the sample, this latter report being dated March 12, 1946.

Sample No. 12602–H on March 7, 1946, contained one dead adult storage beetle, and a 23.5 per cent "moldy" average, according to the microbiological test. The "sample summary" made at the Boston station reported that "at least 50% of the raisins are moldy." This latter report was dated December 12, 1945. Sample No. 35073–H was tested at St. Louis, and report was dated March 1, 1946. *"Product contains moldy and rotten raisins. Raisins are filthy."* (Emphasis supplied throughout.)

Sample No. 15034–H was tested at Chicago. The report is dated April 8, 1946. "Average total reject, 18.5%. Average sandy, 46.8% * * * Product contains decomposed (moldy) and sandy berries."

Sample No. 15035–H, tested at Chicago, report dated April 11, 1946. "Average sandy, 44.5%. The raisins are gritty when chewed * * * decomposed," and so on—literally *ad nauseam!*

It should be noted that for "U. S. Grade C or U. S. Standard Thompson Seedless raisins", the classifications here involved, the following Regulation has been promulgated by the United States Department of Agriculture (Code of Federal Regulations, 1946 Supp., Titles 1–8, Title 7, Chapter I, Sections 52.608):

"Not more than 5 percent by weight of raisins may be affected by mold, decay, fermentation, insect infestation (no live insects are permitted), imbedded dirt, or other foreign material; *Provided,* That not more than 2 percent by weight may be affected by decay."

The defendants try to make capital out of the claim that "At trial plaintiff produced no evidence as to the extent of mold *by weight* when the raisins were tested and, of course, none as to the extent of mold by weight, if any, when the raisins were sold."

█ The Court is not impressed by this contention. A careful study of the exhibits and the testimony has convinced this Court that "more than 5%" of the raisins were "affected by mold" and that "more than 2%" were "affected by decay"—whether the percentage be computed by weight, by volume, or *ad valorem!*

In a letter to the Fruit and Vegetable Branch of the United States Department of Agriculture, at Berkeley, dated October 21, 1946, one of defendants complained as follows:

"The raisins involved were shipped from our plant between November 1, 1945 and December 12, 1945. (The evidence shows that the *largest* shipment was made on January 11, 1946). They were in good condition and in the same condition as other shipments which were made and on which there have been no complaints. Further, the buyers accepted these raisins and paid for them, but instead of disposing of the raisins the buyers held them in storage for several months, that is, until about May of 1946, at which time we were informed that some mold had been discovered."

At the trial, however, Mrs. Doris H. Tilden, a chemical analyst for Food and Drug at San Francisco, who made a "check examination" of Sample No. 35073–H, supra, on March 13, 1946, testified that, in her opinion, the sample was "moldy at the time of shipment". The record bears out Mrs. Tilden's testimony, and the Court believes it. It should be noted that the raisins covered by Boston

Station's Sample Summary on Sample No. 12601–H, dated December 10, 1945, were shipped from Turlock on November 1, 1945—or a little more than one month before the date of the Boston report.

Oscar Knutsen, one of the defendants, testified that the condemned raisins were sold to a winery for $210 a ton. Similarly, in their brief, the defendants state that "For non-standard quality raisins which couldn't be sold for consumption, the price was slightly in excess of $200 per ton."

In the letter to the Department of Agriculture, already referred to, K. Knutsen explained the reason for the sale of the seized raisins:

"* * * in order to avoid as much loss as possible, we did make arrangements to have the raisins returned to California and sold for the making of alcohol, although we were not obligated to secure release of the raisins and divert them to distilling purposes. The only reason it was done was that we wished to continue doing business with the concerns which had purchased these raisins. In other words, the only reason we disposed of the raisins in such manner and made an adjustment with the buyers was on the basis that we were willing to take a loss rather than lose possible future business with these buyers."

The foregoing summary of the evidence relative to the conversion of the condemned raisins into alcohol, is relevant to a somewhat confusing argument by the defendants, next to be considered.

The defendants' brief contains this cryptic statement:

"As to all defendants' purchases, defendants paid to the farmer approximately $140.00 more than the market price for Soda Dipped quality Thompson Seedless raisin grapes, which was $50.00. Commodity got two major considerations in return for its purchase price: 1. The raisins, and 2. Defendants overpaying the farmers in order to stimulate production. Now Commodity wants to overlook the latter and apportion all of the purchase price to the former. Commodity wants rescission and return of the purchase price without tendering back the consideration it received."

This argument seems to be related to an equally obscure allegation in the defendants' Answer:

"The consideration paid by defendants in the sale by defendants to Commodity Credit Corporation of 89.34 tons of raisins under 'Plaintiff's Exhibit A' was a subsidy of approximately $85.99 per ton to producers plus the 89.34 tons of raisins and plaintiff has not tendered back or paid to defendants any part of said consideration."

The plaintiff's demand does not call for so abstruse and recondite a comment. As we have just seen, the defendants were permitted to remove the raisins under bond for use in the production of alcohol. The plaintiff now demands the return of the overpayment *in subsidy* on processed raisins sold in civilian channels, because the raisins were not of standard quality, as required by Section 3 of the Agreement. There is no overreaching here.

## 6. In Executing the Contract, Commodity was Discharging a Sovereign Function

The plaintiff has submitted a memorandum to assist the Court in determining the validity of the arguments advanced at the trial by the defendants that the agreement in question is governed by the Uniform Sales Act of California.

The defendants, however, have enlarged the discussion in their brief, and the Court is now considering the case in all its phases.

In Section 4003.57(b) of Chapter XVIII, "Office of Stabilization Administrator", Title 32, Code of Federal Regulations, 1945 Supplement, at page 3569, we find the following:

"(b) The Department of Agriculture is authorized and directed to

subsidize processors' sales of processed raisins * * * to purchasers other than government procurement agencies and other than for export to destinations or ports outside Territories and Possessions of the United States, through use of funds of Commodity Credit Corporation, so as to enable such processors to pay the producer prices specified in paragraph (a) (1) hereof and to sell such processed raisins at applicable maximum prices to be established by Office of Price Administration * * * "

The contract itself contained the following preamble:

"Whereas, in order to assure an adequate supply of standard quality processed raisins of the 1945 crop for the needs of Government agencies and for civilian consumption and to assure the proper and orderly marketing thereof, Commodity desires to purchase certain processed raisins and to make certain disposition of the raisins purchased, * * * "

The Regulation and the contract make it clear that, in executing the agreement now before the Court, Commodity, a wholly Government-owned corporation,[2] was discharging a sovereign function.

In another wartime raisin case, apparently overlooked by counsel, Gray v. Commodity Credit Corp., D.C.Cal.1945, 63 F. Supp. 386, 394–395, affirmed, 9 Cir., 1947, 159 F.2d 243, certiorari denied, 1947, 331 U.S. 842–843, 67 S.Ct. 1533, the Court said:

"There is, therefore, no substance to the argument that this is a dispute between certain individuals and a private Delaware corporation, the measure of the powers of which is to be sought in the law applicable to private corporations. Here we have a Government corporation, organized

in peace time not merely being used for the exercise of war time functions, but made a part of a greater whole to be known as the War Food Administration, in order to carry into effect not only general and statutory war powers of the President, but a definite program of food production and distribution. So that, in effect, the plaintiffs are attacking the power of the War Food Administration, which organized and carried to full fruition, through its various agencies, the raisin program of 1944."

In Federal Land Bank v. Bismarck Lumber Co., 1941, 314 U.S. 95, 102, 62 S.Ct. 1, 5, 86 L.Ed. 65, the Court used the following language:

"The argument that the lending functions of the federal land banks are proprietary rather than governmental misconceives the nature of the federal government with respect to every function which it performs. The federal government is one of delegated powers, and from that it necessarily follows that any constitutional exercise of its delegated powers is governmental. * * * It also follows that *when Congress constitutionally creates a corporation through which the federal government lawfully acts, the activities of such corporation are governmental.*" (Emphasis supplied.)[3]

7. Especially When Acting in a Strictly Sovereign Capacity, the Government is Not Subject to State Law

■ We advance, therefore, from the proposition that, when the defendants signed the agreement in question, they were dealing, in fact and in law, with the Government of the United States.

From that basic assumption, we proceed to inquire whether state notions governing timely notice of breach of warranty, actual damage from such breach,

---

2. See CFR, Vol. 1, Title 6, "Agricultural Credit", Chapter II, Section 200.6.

3. See also D'Oench, Duhme & Co. v. Federal Deposit Ins. Corporation, 1942, 315 U.S. 447, 455–456, 62 S.Ct. 676, 86 L.Ed. 956.

the effect of laches, and the like, are applicable to the Government when it is properly discharging one of its lawful functions.

A lucid statement of the law in this respect is found in the opinion of Mr. Justice Jackson in United States v. Allegheny County, 1944, 322 U.S. 174, 182–183, 64 S.Ct. 908, 913, 88 L.Ed. 1209:

"Every acquisition, holding, or disposition of property by the Federal Government depends upon proper exercise of a constitutional grant of power. * * *

"Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. *The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state.*" (Many cases cited.)[4] (Emphasis supplied.)

■ In their answer, the defendants assert that the complaint is barred by California statutes of limitations and also by laches. In this connection, the language of the Supreme Court in Board of Comr's of Jackson County v. United States, 1939, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313, is quite apposite:

" * * * state notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise."

So far, the sovereign character of the plaintiff's role in the instant case has been emphasized. But it is not necessary to rely upon this aspect of the case alone. In other litigation, this Court has had occasion to quote the following language from the opinion in Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 383–384, 68 S.Ct. 1, 3, 92 L.Ed. 10:

"It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures. Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it."

8. The Plaintiff is Not Entitled to Interest

■ It will be remembered that the plaintiff asks for interest. In view of the long delay in bringing suit and in serving process, the Court is of the opinion that the plaintiff is not entitled to such an award.

In Board of Comr's of Jackson County v. United States, supra, 308 U.S. at page 352, 60 S.Ct. at page 289, 84 L.Ed. 313, it was said, regarding the Government's right to recover interest under the facts of that case:

"The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable. (Cases cited.)

" * * * Here is a long, unexcused delay in the assertion of a right for which Jackson County should not be penalized."

4. See also United States v. Ansonia Brass & Copper Co., 1910, 218 U.S. 452, 462–463, 31 S.Ct. 49, 54 L.Ed. 1107; Carpenter v. Shaw, 1930, 280 U.S. 363, 367–368, 50 S.Ct. 121, 74 L.Ed. 478; Deitrick v. Greaney, 1940, 309 U.S. 190, 200–201, 60 S.Ct. 480, 84 L.Ed. 694; Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 366, 367, 63 S.Ct. 573, 87 L.Ed. 838.

### 9. Conclusion

In its summary of the evidence, the Court has indicated that, because of the defendants' breach of the warranty that the raisins should be of "standard quality"—i. e., "clean" and "sound"—the plaintiff is entitled to a refund of its subsidy payments, as set forth in the first count of the complaint, in the sum of $7,-651.61.

The plaintiff is likewise entitled to recover on the second count of its complaint, dealing with an overpaid subsidy amounting to $71.67, on certain quantities of processed raisins not actually shipped to civilian purchasers.

Finally, because of its unexplained delay in filing this suit and in serving process upon the defendants, the plaintiff is not entitled to interest.