# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 02-3747

_____

| | | |
|---|---|---|
| Entergy Arkansas, Inc., an Arkansas corporation; Entergy Gulf States, Inc., a Texas corporation; Entergy Louisiana, Inc., a Louisiana corporation; Wolf Creek Nuclear Operating Corporation, a Delaware corporation; | * * * * * * | |
| Plaintiffs-Appellees, | * * | |
| Central Interstate Low-Level Radioactive Waste Commission; | * * * | |
| Plaintiff-Appellee, | * | |
| U.S. Ecology, Inc., a California corporation; | * * * | Appeal from the United States District Court for the District of Nebraska. |
| Intervenor Plaintiff-Appellee, | * * | |
| v. | * * | |
| State of Nebraska; Nebraska Department of Environmental Quality; Nebraska Department of Health and Human Services Regulation & Licensure; The Governor, of the State of Nebraska; The Director, of the Nebraska Department of Environmental Quality; The Director, of the Nebraska Department of Health and Human Services Regulation and Licensure, | * * * * * * * * * * * | |
| Defendants-Appellants. | * | |

Submitted:  June 12, 2003
Filed:  February 18, 2004
_____

Before BOWMAN, MURPHY, and BYE, Circuit Judges.
_____

MURPHY, Circuit Judge.

The State of Nebraska and two of its departments (Nebraska)[1] appeal from a final judgment involving the attempt to develop a radioactive waste disposal facility under the Central Interstate Low-Level Radioactive Waste Compact (the Compact). The Compact was created and entered into by five member states and was also enacted into law by Congress. The Compact members agreed to build a disposal facility in one of the member states, and they also agreed to create a commission to carry out their program, the Central Interstate Low-Level Radioactive Waste Commission (the Commission). Nebraska was selected as the site for the facility, and the Commission is a plaintiff in this case.

This action was originally brought against Nebraska and the Commission by utility companies from the five Compact states: Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Wolf Creek Nuclear Operating Corporation, and the Omaha Public Power District. The Commission brought crossclaims against U.S.

_____

[1]The defendants named in the Commission's complaint were the State of Nebraska, the Governor of the State of Nebraska in his official capacity, the Director of the Nebraska Department of Environmental Quality in his official capacity, and the Director of the Nebraska Department of Health and Human Services Regulation & Licensure in his official capacity.

Ecology, Inc. and Nebraska, and the district court[2] granted its motion to realign itself as a plaintiff. After years of litigation and a number of appeals to this court, the case was tried to the district court for two months. The court later issued extensive findings and conclusions and ruled in favor of the Commission. It found that Nebraska had not carried out its obligations under the Compact in good faith and that the Commission was entitled to recover over $97 million for funds and work expended in the thwarted attempt to construct the radioactive waste disposal facility.

Nebraska argues on appeal that the district court erred in denying it a jury trial, in its findings of bad faith, in awarding monetary relief and interest, and in several other points, some of which were decided against it on earlier appeals. See Entergy, Arkansas, Inc. v. Nebraska, 241 F.3d 979, 987–88 (8th Cir. 2001) [Entergy II] (affirming district court holding that waiver of sovereign immunity extended to suit for monetary relief); Entergy Arkansas, Inc. v. Nebraska, 210 F.3d 887, 898 (8th Cir. 2000) [Entergy I] (Nebraska waived its sovereign immunity by entering into the Compact). After carefully studying the voluminous record, we affirm.

I.

A.

We have already addressed the Compact and related issues in a series of earlier appeals in this case, and those decisions provide additional background to that which follows.[3] In 1980 Congress enacted the Low-Level Radioactive Waste Policy Act,

---

[2]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska.

[3]See Entergy II, 241 F.3d 979 (8th Cir. 2001); Entergy I, 210 F.3d 887 (8th Cir. 2000); Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n, 207 F.3d 1021 (8th Cir. 2000) (Nebraska did not have veto power over low level radioactive waste export permits); Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n, 187 F.3d 982 (8th Cir. 1999) (Commission has power under the Compact to impose a deadline for state licensing determination); County

Pub. L. No. 96-573, 94 Stat. 3347 (1980), in order to "promote the development of regional low-level radioactive waste disposal facilities" by the various states. Concerned Citizens of Neb. v. United States Nuclear Regulatory Comm'n, 970 F.2d 421, 422 (8th Cir. 1992). Pursuant to the Act, Nebraska, Arkansas, Kansas, Louisiana, and Oklahoma entered into the Compact to establish and operate one or more facilities to process low level radioactive waste (LLRW) generated in the member states. Art. III(a).[4] Congress consented to the Compact and enacted it as original legislation, as did each of the five states. See Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act, Pub. L. No. 99-240, § 222, 99 Stat. 1859, 1863 (1986) (reprinting the Compact); Entergy II, 241 F.3d at 982.

The Compact established the Commission as its governing body and created a framework for it to select an applicant to develop disposal facilities in the member states. Art. V. Each member state is represented on the Commission by one representative and is entitled to a single vote. Art. IV(a), (b). No action of the Commission is binding unless a majority of the member states casts its votes in the affirmative. Id. Each state was to have an opportunity to volunteer to host a regional facility. Art. V(a). If no state volunteered or if no volunteer state's proposal were acceptable, then the Commission would publicly seek proposals from applicants to develop and operate one or more regional facilities as necessary. Art. V(b).

---

of Boyd v. US Ecology, Inc., 48 F.3d 359 (8th Cir. 1995) (rejecting Nebraska's claim that community consent had not been properly obtained); Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n, 26 F.3d 77 (8th Cir. 1994) (rejecting challenge to site selection process); Burton v. Central Interstate Low-Level Radioactive Waste Comm'n, 23 F.3d 208 (8th Cir. 1994) (ratepayers and electors for Nebraska power districts lacked standing to challenge Commission actions); Concerned Citizens of Neb. v. United States Nuclear Regulatory Comm'n, 970 F.2d 421 (8th Cir. 1992) (no fundamental right to be free from nonnatural radiation); See also Thomas O. Kelly, Note, Nebraska's $160 Million Liability?—Entergy, Arkansas, Inc. v. Nebraska, 241 F.3d. 979 (8th Cir. 2001), 80 Neb. L. Rev. 574 (2001).

[4]References to the Compact are cited by article number.

Proposals were to be considered on the basis of the following criteria: (1) the applicant's ability to obtain necessary licenses from applicable governmental authorities; (2) the economic efficiency of the proposed facility; (3) whether the applicant had sufficient financial resources to fund and maintain the facility; (4) the accessibility of the proposed facility to all the party states; and (5) any other criteria the Commission might deem necessary to ensure the health, safety, and welfare of the citizens of the region and party states. Art. V(c). The Compact provided that an applicant selected by the Commission to construct a radioactive waste disposal facility would have to obtain required licenses from the appropriate state licensing agencies (or the United States Nuclear Regulatory Commission in some circumstances). Art. V(e)(2).

The Compact also created specific rights and obligations in each of the member states. A state selected as the site for a disposal facility must "process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V(e)(2). To the extent authorized by Federal and host State law, the host state must regulate and license any regional facility within its borders and ensure the extended care of such facility. Art. III(b). Each state has "the right to rely on the good faith performance of each other party state," Art. III(f), and the Commission "shall . . . [r]equire all party states . . . to perform their duties and obligations arising under this compact." Art. IV(m)(8). A party state which is found to have arbitrarily or capriciously denied or delayed the issuance of a license . . . or which otherwise fails to live up to its obligations under the Compact may have its membership revoked by a two thirds vote of member states. Art. V(g), VII(e). A state may withdraw from the Compact at any time by enacting a statute announcing its withdrawal, but the withdrawal will not be effective until five years after notice is served on the other member states, unless they unanimously agree to allow immediate withdrawal. Art. VII(d). Withdrawal or revocation does not affect any liability incurred by a party state before its membership effectively expires. Art. VII(d), (e).

-5-

Since no state volunteered to host the LLRW disposal facility, the Commission invited development proposals from outside applicants. In February 1987, U.S. Ecology, Inc. (USE) submitted a proposal to site, license, develop, construct, and operate a facility, and in December of that year the Commission selected Nebraska to host the first disposal facility. After a number of Nebraska localities requested that the facility be built in their community, the Commission selected Boyd County as the most promising location. The Commission then entered into a formal contract with USE in January 1988 to develop a facility in Boyd County. USE agreed to prepare and file the necessary license applications with the state and federal governments and to construct and maintain the facility if its applications were successful.

Nebraska officials showed hostility to the idea of an LLRW facility in their state almost from the beginning. After the state was chosen over its negative vote to be the first host, Governor Kay Orr stated publicly that Nebraska was not happy to be the site for a disposal facility, but that it would honor its commitments under the Compact. See Entergy II, 241 F.3d at 983. During her campaign for reelection, the waste facility became an issue and Orr was attacked by candidate Ben Nelson "for doing far too little to protect the interests and respond to the concerns" of local residents. Entergy Arkansas, Inc., 226 F. Supp. 2d at 1061 (internal quotation marks omitted). Nelson promised that if he were elected governor, "it is not likely that there will be a nuclear dump in . . . Nebraska." Id. Nelson won the election and entered into office in January 1991, and the district court found that the new administration soon began to work actively to prevent construction of the LLRW facility.

Although the licensing process had been initiated, it dragged on for over eight years. In 1990 USE submitted its initial license application to the Low-Level Radioactive Waste Program (LLRW Program). This program was operated by the Nebraska Department of Environmental Quality (DEQ) and the Department of Health and Human Services and Licensure (DOH), and these agencies required USE to answer some 700 questions before they would even undertake a review of the application. The process was made more difficult when Randolph Wood, the

governor's appointee to lead the DEQ, stopped exchanging information with USE and refused to accept its responses to any questions until all 700 answers were submitted together. The review process was further complicated by Nebraska's failure to budget for it. The Nebraska Auditor of Public Accounts found in July 1992 that DEQ had not adopted a budget to control the cost of the review process or a timetable to complete the work. The auditor recommended that DEQ do so, but Wood did not follow the recommendation.

After USE submitted answers to all the agency questions, DEQ issued a Notice of Intent to Deny the license in January 1993. The reasons given by DEQ for denial were that the site had wetlands and drainage problems. USE then initiated a contested case administrative proceeding under state law to challenge DEQ's decision. That proceeding was settled, and USE withdrew its administrative case and amended its licensing application. The review process then continued with more questions and technical review of the amended application.

The reinstituted review suffered a serious setback in 1995, when Nebraska told its contractors doing technical review to cut back their work by twenty five percent because of a dispute with the Commission over federal rebate funds.[5] Even after Nebraska settled this dispute and promised to accelerate its review, the amount of work done on the review continued to decline. After responding to four rounds of questions from Nebraska's many consultants, USE advised Nebraska that its application was finally complete on July 11, 1995. Nebraska responded two weeks

---

[5]Nebraska sued the Commission for access to federal funds which had been disbursed to the Commission "for eventual payment to the host state." Entergy Arkansas, Inc., 226 F. Supp. 2d at 1075. The Commission counterclaimed, arguing that Nebraska had failed to demonstrate that rebate funds previously distributed to the state had been used appropriately. Id. The action was settled when the Commission agreed to pay Nebraska a portion of the rebate funds it sought and Nebraska agreed to provide an accounting. Id. The rebate fund payments are distinct from funds reimbursed to Nebraska by USE to cover the state's expenditures in reviewing the license application.

later, stating that it would accept no further materials related to the application unless specifically requested by its reviewers.

DEQ and DOH initially stated that their review of the completed application would take approximately one year to complete, but DEQ later notified USE that the review would take substantially longer. It reported that two technical documents being prepared for the state would not be finished until October 1997, more than two years after the submission of USE's completed application. Because of concern over this delay, the Commission imposed a deadline of January 14, 1997 for Nebraska to complete its review of USE's application. Nebraska sued to have the deadline withdrawn, but we held on appeal that the Compact gave the Commission power to set the deadline. Nebraska, 187 F.3d at 986.

The January deadline imposed by the Commission passed without a final determination by Nebraska, but many months later in October 1997 the state released two key reports. One was the Draft Safety Evaluation Report (DSER) which found that "the facility met site suitability requirements." Entergy II, 241 F.3d at 984. The DSER concluded that

> the LLRW Program [has] determined that the data and information presented in U.S. Ecology's license application are acceptable. . . . [and that] US Ecology has provided documentation that reasonably demonstrates that [it] can obtain the necessary funds to cover the estimated costs of conducting licensed activities over the planned operating life of the facility, including the cost of construction and disposal.

Entergy Arkansas, Inc., 226 F. Supp. 2d at 1079 (internal quotation marks omitted). The other was Nebraska's Independent Performance Assessment (IPA). The IPA reported that even assuming the underlying soil was entirely saturated with water, the long term performance of the structures after closure would easily satisfy regulatory criteria regarding radioactive exposure for humans. Despite these favorable assessments, the review process did not draw to a close.

Nebraska finally denied USE's amended license application in December 1998, more than eight years after USE's initial application was submitted. The state did not rely upon the favorable findings reached in 1997 by the DSER and the IPA. Instead, the reasons given for denial were "that there was insufficient depth of the water table at the site, that under the applicable regulations [DEQ] could not consider engineered improvements to the site, and that USE had not shown financial ability to build and run the facility." Entergy II, 241 F.3d at 984. The district court found after hearing all the evidence that these reasons were pretextual and that the license had actually been denied without regard to the technical merits of the application, but rather to fulfill the governor's campaign promise to block development of the site. After its application was denied, USE filed another contested case petition under Nebraska law on January 15, 1999; this second administrative proceeding was enjoined by the district court on the Commission's motion (affirmed in Entergy I, 210 F.3d at 890). In August of the same year, the State of Nebraska announced its intention to withdraw from the Compact, Neb. Rev. Stat. § 71-3522 (effective Aug. 28, 1999), but its withdrawal will not become effective until August 28, 2004. Any obligations incurred under the Compact prior to that date will still need to be fulfilled. See Art.VII(d).

It is undisputed that the Nebraska licensing process became very expensive. Not only did the process extend for nearly a decade, but the technological issues involved in the development of an LLRW disposal facility are extraordinarily complex. To deal with all of the technical and regulatory issues involved, both the state and USE had to hire many outside consultants—including sophisticated engineering groups, scientific advisors, and law firms—and to retain them for much of the process. The state also constructed a scientific laboratory near the proposed site in order to conduct testing to evaluate the suitability of the site and the application. In fact, the state was spending so much that the Nebraska Auditor of Public Accounts recommended that it control costs by revising its agreement with its primary contractor, HDR Engineering, Inc. The technical complexity of the process and the demands placed on USE's application are reflected in the length of its final

submission. (The original application was approximately 4000 pages, but grew to 30,000 pages after four rounds of questions from some 100 state consultants.)

The district court found that by the time the license was finally denied, over $88 million had been spent directly on the application process. See Entergy Arkansas, Inc. v. Nebraska, 226 F. Supp. 2d 1047, 1101 (D. Neb. 2002). Under Nebraska law the applicant for an LLRW license is responsible for all costs of the licensing process, including the costs incurred by the state. This meant that USE was held responsible for whatever Nebraska chose to spend on the process, as well as for its own expenditures in meeting the requirements set by the state. In return for USE's undertaking to obtain a license and develop the radioactive waste disposal site and for extending up to $6.26 million in work, the Commission agreed to advance it the costs. The Commission was thus accountable for nearly the entire cost of the LLRW licensing process, including the state's expenditures, while Nebraska controlled the length and requirements of the process.

The Commission did not have resources to cover the high costs of the application process. In order to carry out the decision of the member states to construct an LLRW facility in Nebraska, it entered into an agreement with a group of LLRW generators in the five Compact states. These included Entergy Arkansas, Inc., Entergy Gulf States, Inc., Entergy Louisiana, Inc., and Wolf Creek Nuclear Operating Corp. (the Generators). Since the Generators produce radioactive waste through their generation of electricity, they could be expected to benefit from the construction of a waste disposal facility.

The Generators' agreement with the Commission (and subsequent amendments to it) provided that they would prepay for disposal services they expected to receive in the future. By these prepayments, they advanced funds to the Commission which it used to meet its commitment to USE. In this way the licensing expenses of all the parties were paid by the Commission, using assets it had received in the form of prepayments collected from the Generators and work performed by USE.

B.

This action was initiated by the Generators after they had advanced over $88 million during the long and futile licensing process, and USE intervened as a plaintiff. Plaintiffs alleged that Nebraska had violated the good faith provision of the Compact, as well as their constitutionally protected rights to procedural and substantive due process, by deliberately delaying review of the license for eight years and by intending that the process end in denial of the application. See Entergy II, 241 F.3d at 984–85. USE alleged in addition that the Nebraska defendants had engaged in tortious interference and conspiracy. The Commission was also named as a defendant in the action, but the district court realigned it as a plaintiff after it filed a crossclaim against Nebraska.

The Commission sought declaratory and injunctive relief against Nebraska, removal of the state from the licensing process and substitution of a neutral third party so that a waste facility could be built, an accounting of all funds turned over to the state, damages, and attorney fees. The damages sought in its amended complaint included "all lost value of costs incurred and money therefore paid out by the Commission" because of Nebraska's bad faith and delaying tactics. USE and the Generators also sought legal and injunctive relief and asserted crossclaims against the Commission for breach of contract and for a constructive trust on any funds it recovered from Nebraska.

A number of motions were filed by the parties. The Commission and the Generators moved for a preliminary injunction to enjoin the ongoing second contested case proceeding in Nebraska, and that motion was granted. See Entergy, Arkansas, Inc. v. Nebraska, 46 F. Supp. 2d 977, 992, 996 (D. Neb. 1999). Nebraska made two motions to dismiss, arguing that the district court lacked subject matter jurisdiction and that the plaintiffs had failed to state claims upon which relief could be granted. The district court denied all but one part of Nebraska's motions. It ruled that in respect to the claims of the Generators and USE, the Eleventh Amendment protected the state and its officers in their official capacity against anything other than

declaratory and injunctive relief.  See Entergy, Arkansas, Inc. v. Nebraska, 68 F. Supp. 2d 1093, 1103–04 (D. Neb. 1999); Entergy, Arkansas, Inc. v. Nebraska, 68 F. Supp. 2d 1104, 1110 (D. Neb. 1999).

Nebraska appealed from the preliminary injunction, arguing that "the district court lacked jurisdiction over it, that the Commission had failed to make the necessary showing for [an] . . . injunction, and that the injunction violated the Anti-Injunction Act." Entergy I, 210 F.3d at 895–96.  We affirmed after concluding that there was jurisdiction because Nebraska had waived its sovereign immunity from suit in federal court by entering into the Compact.  See id. at 897.  We also decided that the plaintiffs had made a sufficient showing for preliminary injunctive relief and that it was not barred by the Anti-Injunction Act.

Nebraska also appealed the denial of its motions to dismiss on the grounds of Eleventh Amendment immunity.  Entergy II, 241 F.3d at 986.  We ruled that Nebraska had waived its sovereign immunity to an action brought by the Commission by "entering into a compact in which the party states delegated to the Commission their authority to sue for breach and required the Commission to enforce contractual obligations." Id. at 988.  We affirmed the district court's determination that the state's waiver of immunity extended to the Commission's claim for damages and its denial of Nebraska's motion to dismiss the Commission's claims.

As to the claims asserted under the Compact by USE and the Generators, we reversed, holding that the good faith provision of the Compact did not create an enforceable federal right for these parties.  Their claims based on the Compact should therefore have been dismissed.  Their due process claims were remanded for further analysis and then dismissed on remand. See Entergy Arkansas, Inc. v. Nebraska, 161 F. Supp. 2d 1001, 1002 (D. Neb. 2001).

Our decision in Entergy II allowed the Commission's suit against Nebraska to proceed.  Before trial the Commission moved to strike Nebraska's jury demand.  The district court granted the motion after concluding that the state had no Seventh

Amendment right to a jury trial in the circumstances of this case. See Entergy Arkansas, Inc. v. Nebraska, 186 F. Supp. 2d 1036, 1041 (D. Neb. 2002). There followed an eight week bench trial, after which the court issued findings and conclusions in favor of the Commission in a lengthy memorandum and order. See Entergy Arkansas, Inc., 226 F. Supp. 2d at 1047–1174. The detailed findings of the district court relevant to bad faith alone took up almost 40 printed pages. See id. at 1102–40.

The district court found that Nebraska had breached its duty of good faith under the Compact. Its subsidiary findings included the following:

> (1) Governor Nelson, either directly or through his subordinates, influenced the process in order to fulfill a campaign promise which required that the license be denied without regard to the technical merits; (2) [the state] administration did not work diligently to ensure that the application was considered fairly and reasonably; and (3) DEQ and DOH did not act fairly or reasonably.

Id. at 1143.

The district court also found that all the funds expended in the licensing process and the work credits obtained from USE were assets of the Commission. It had acquired them in consideration for agreements allowing USE to develop the waste site and the Generators to receive future radioactive waste disposal services, and the Commission drew on them to fund the licensing process. The district court found that the entire value of the funds and credits had been lost as a direct result of Nebraska's bad faith.

Based on these findings, the district court granted declaratory relief but concluded that the equitable relief originally requested by the Commission could no longer be granted. The Commission had sought sweeping injunctive relief against

-13-

Nebraska including completion of the licensing process under court supervision,[6] but the court found that a "long-standing lack of professionalism and independence" in the state departments gave it "no confidence that the staff . . . could be restored to an objective state of mind by a mere court order." Id. at 1160. The court also found that "many of the key consultants . . . [had] been put in the position of having to defend Nebraska" and that it was not realistic to "suggest that [they] could fairly be expected to drop their defensive duties and resume the role of independent consultants." Id. The court also found that Nebraska's withdrawal from the Compact could limit the future enforcement of injunctive relief and that establishment of any new oversight entity should not be attempted by judicial action. For these reasons and because granting "[n]o affirmative equitable relief is better than problematic equitable relief," injunctive relief was deemed impractical.[7] Id.

The district court instead fashioned monetary relief, declaring that the Commission was entitled to recover damages for the entire principal value of the expended funds and for the work performed by and credited to USE. In addition to the over $88 million spent on the application process, it found the Commission was entitled to recover $3 million in community improvement funds it had paid to Nebraska towns in the vicinity of the proposed waste facility because the value of these funds was entirely lost due to Nebraska's bad faith.[8] The district court also

[6]The Commission's request that the court "create a just and equitable remedy, including injunction and mandamus as required" also suggested that this might require removing the application process from Nebraska's control and substituting an "appropriate means of completing the licensing," such as through a special master, some "scientifically qualified" group, or an impartial governmental agency, "all at defendant Nebraska's cost."

[7]The district court also denied the Commission's request for an accounting of the federal rebate funds paid out to Nebraska and rejected crossclaims by the Generators for breach of contract and for a constructive trust. Id. at 1141, 1162. No appeal was taken from these rulings.

[8]Such payments were required under Commission Rule 9 which was adopted by the Commission at its December 8, 1987 meeting at the request of

found that the entire value of the "sweat equity" from USE had been lost as a result of Nebraska's noncompliance, and the Commission could therefore recover approximately $6.26 million for work credited to it. The amount the district court found owing to the Commission thus totaled over $97 million, to which it added prejudgment interest of approximately $53 million, as well as postjudgment interest. Judgment was entered in favor of the Commission against Nebraska for a total of $151,408,240.37.

On appeal, Nebraska raises a number of issues. First, it contends that the district court erred by striking its jury demand, arguing that the Commission's suit is like a contract action tried to a jury at common law. It asserts that the court erred by not applying an arbitrary and capricious standard in its consideration of Nebraska's obligations under the Compact and that the only remedy available for the Commission was injunctive relief. Nebraska further contends that the Commission suffered no losses itself but is only seeking to recover for others and that the district court overstated the amount of the losses. Finally, the state attacks the award of interest, arguing that it retained its sovereign immunity as to an award of interest, that there was no legal basis for an award of prejudgment interest, and that the amount was miscalculated. The Commission counters that Nebraska was not entitled to a jury trial in a case such as this, that the district court's findings were well supported by the evidence and the law, that the damages awarded were appropriate and accurately reflected the actual costs caused by Nebraska's bad faith, and that interest was properly granted to make it whole.

---

Nebraska Governor Kay Orr. The funds had been advanced to the Commission by the nonhost states.

-15-

II.

A.

Nebraska first argues that the district court erred by striking its jury trial demand. Whether a party is "entitled to a jury trial under the Seventh Amendment is a question of law" which we review de novo. Kampa v. White Consol. Indus., 115 F.3d 585, 586 (8th Cir. 1997).

The Seventh Amendment guarantees that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. Over the years, the Supreme Court has consistently explained that the "'right of trial by jury thus preserved is the right which existed under the English common law when the amendment was adopted.'" Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996) (quoting Balt. & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657 (1935)). Since the common law at the time of the amendment provided for "a jury trial . . . in suits brought in the English *law* courts," Tull v. United States, 481 U.S. 412, 417 (1987) (emphasis in original), the Seventh Amendment guarantee extends to any cause of action "'that either was tried at law at the time of the founding or is at least analogous to one that was.'" City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 708 (1999) (quoting Markman, 517 U.S. at 376).

Deciding whether an action fits the historical test employed by the Supreme Court involves two inquiries. See Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 348 (1998); see also Charles W. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639, 639-42 (1973) (describing development of historical test). First, the action in question should be compared "to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity" to determine whether it is more analogous to an action that would have been tried in a court of law or in equity. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 42 (1989). Second, the remedy sought should be examined to "determine whether it

-16-

is legal or equitable in nature." Id. See also Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990) (plurality opinion) (discussing two part test).

Nebraska urges that the best Eighteenth Century analog to the present case is a simple contract action which would have been tried to a jury at common law. The Commission argues that this analogy does not fit in this case which involves an agreement among sovereign states enacted into law by Congress.

This action arises out of the Compact which is a congressionally sanctioned interstate compact specifically authorized under the United States Constitution. The Compact Clause permits states with "the Consent of Congress . . . [to] enter into an[] Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. The impetus for the Compact grew out of an act of Congress in 1980, the Low-Level Radioactive Waste Policy Act, Pub. L. No. 96-573, 94 Stat. 3347 (1980). The states of Nebraska, Arkansas, Kansas, Louisiana, and Oklahoma entered into the Compact after the statute was passed in order "to cooperate in the protection of the health, safety and welfare of their citizens and the environment" by providing for the "management of low-level radioactive wastes." Art. I. The Compact went into effect in 1986 after it was approved by Congress. See Omnibus Low-Level Radioactive Waste Compact Consent Act, Pub. L. No. 99-240, § 222, 99 Stat. 1859, 1863 (1986).

Although the Supreme Court has acknowledged that an interstate compact is like a contract to the extent that it is "a legal document that must be construed and applied in accordance with its terms," Texas v. New Mexico, 482 U.S. 124, 128 (1987), the Court has also recognized the unique features and functions of such a compact. An interstate compact is one "of two methods under our Constitution of settling controversies between States," Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 279 n.5 (1959), and it "performs high functions in our federalism," id.

at 279.[9]  See also Felix Frankfurter & James M. Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L.J. 685, 691-95 (1925) (discussing history of Compact Clause).  An interstate compact represents a political compromise between "constituent elements of the Union," as opposed to a commercial transaction.  Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 40 (1994).  Such an agreement is made to "address interests and problems that do not coincide nicely either with the national boundaries or with State lines—interests that may be badly served or not served at all by the ordinary channels of National or State political action."  Id. (internal quotation marks omitted).

While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may directly impact the population, the economy, and the physical environment in the whole of the compact area.  A suit alleging that a state has breached an obligation owed to its sister states under a congressionally approved interstate compact also raises delicate questions bearing upon the relationship among separate sovereign polities with respect to matters of both regional and national import.

The source of the Commission's right to sue for breach of the Compact differs from a right created by a contract.  The Commission's right to bring this action arises not from state common law, but from federal law since congressional approval was required to make the Compact law.  See U.S. Const. art. I, § 10, cl. 3.  The terms of the Compact became federal law when it was approved by Congress.  See Entergy I, 210 F.3d at 897 ("The rights that the Commission seeks to enforce are federal rights . . . .").  It was Congress, through its approval of the Compact, which established a regulatory scheme to govern the mutual rights and obligations of the party states.  Within this framework the Commission is to "hear and negotiate disputes which may arise between the party states regarding this Compact."  Art. IV(m)(3).

_____

[9]Invocation of the Supreme Court's original jurisdiction is the other means of interstate dispute resolution explicitly mentioned in the Constitution.  See U.S. Const. art. III, § 2, cl. 2; Petty, 359 U.S. at 279 n.5.

By means of the Compact, the member states "delegate[d] authority to the Commission to initiate" proceedings to enforce their compact obligations. Entergy II, 241 F.3d at 987–88 (citing Art. IV(e), (m)(8)). Indeed, the Compact commands that the "Commission shall . . . require all party states . . . to perform their duties and obligations arising under this compact." Art. IV(m)(8). The Commission was given the power to carry out that responsibility when the five states agreed to give it authority to enforce the Compact by "initiat[ing] any proceedings . . . before any court of law, or any Federal, state or local agency, board or Commission that has jurisdiction." Art. IV(e). When the Commission acts as the enforcement agency created by the Compact, its rights arise from the federal statutory scheme adopted by Congress through its approval of the Compact, rather than from the common law of contract.

Nebraska argues that since the claims here are brought by the Commission, this is not an action between sovereign states and a jury trial is therefore appropriate. While at common law a sovereign likely had a right to a jury in a contract action with a private party, see Standard Oil Co. of Cal. v. Arizona, 738 F.2d 1021, 1028 (9th Cir. 1984), the Commission cannot be equated with a private litigant. Even though the Commission cannot itself be termed sovereign, see Hess, 513 U.S. at 52, it is a creation of the Compact and represents the sovereign states which made it. Its role within the congressionally approved framework created by the Compact differentiates it from a private litigant enforcing individual rights or obligations. Through the Compact, the member states have "delegate[d] authority to the Commission to initiate" proceedings to enforce their compact obligations, Entergy II, 241 F.3d at 987–88 (citing Art. IV(e), (m)(8)), and they have commanded the Commission to enforce performance by the party states, Art. IV(m)(8). The member states control the actions of the Commission, and it is made up of one voting member from each state and may only take action upon a majority vote of the total membership. See Art. IV(a).

-19-

The Commission is acting here within its delegated enforcement role and with the sanction of a majority vote of the state representatives. This action is brought in the interests of the nonhost member states to give effect to the political agreements embodied in their Compact. In order to deal with the growing problem of radioactive waste and its potential threat to both human health and the environment, the sovereign states of Kansas, Oklahoma, Arkansas, and Louisiana entered into this Compact with Nebraska. By entering into the Compact all five sovereign states recognized that cooperation was necessary for "the protection of the health, safety and welfare of their citizens and the environment." Art. I. Through joint action the states hoped "to limit the number of facilities needed to effectively and efficiently manage low-level radioactive wastes and to encourage the reduction of the generation thereof; and to distribute the costs, benefits and obligations among the party states." Art. I. They agreed that all five states have the right to expect good faith performance by each of the member states, Art. III(f), and they created the Commission as the entity to enforce their interests in performance of its terms.

The Commission urges that the closest Eighteenth Century analogy to this action may be seen in disputes between the colonies. Resolution of such disputes was within the province of the king, who normally referred them to a royal commission in the first instance. See Frankfurter & Landis, supra, at 693. An appeal from a royal commission's decision could be taken to the king in council, id. at 692 n.29, 693, but was "usually delegated to the Privy Council," id. at 692 n.29. See also Virginia v. West Virginia, 246 U.S. 565, 597 (1918) ("[D]ifferences between the colonies were taken to the Privy Council for settlement."). A dispute between the colonies was thus not decided by a court and could not be considered a "common-law cause[] of action ordinarily decided in English law courts," Granfinanciera, 492 U.S. at 42; cf. Markman, 517 U.S. at 381 (specific patent issue was not for a jury even in an action at law, for "patent litigation had remained within the jurisdiction of the Privy Council until 1752 and hence without the option of a jury trial").

The colonial jurisdiction once exercised by the Privy Council has been viewed as akin to the Supreme Court's original jurisdiction over controversies between the

states.  See Virginia, 246 U.S. at 598–99; Frankfurter & Landis, supra, at 694.  Even where monetary relief is sought in original actions between the states, issues of fact are resolved by a special master rather than a jury.  See, e.g., Kansas v. Colorado, 533 U.S. 1, 4–5 (2001); Richard H. Fallon, Jr. et al., Hart & Wechsler's The Federal Courts and the Federal System 273 (5th ed. 2003).  Our research has uncovered no original action between sovereigns in which a jury has been empaneled.  Cf. United States v. Barnett, 330 F.2d 369, 429 n.85/11 (5th Cir. 1963) (opinion of Gewin, J.) (describing the three known instances of trial by jury in the Supreme Court).

Nebraska's contract analogy might have more force if English common law juries had been permitted to determine whether sovereigns had satisfied the rights and obligations owed one another, but they were not.  A search for a precise common law analogy to our case would seek a multistate dispute in which a jury composed of citizens and taxpayers of one of the states was asked to decide issues in which the jurors had a direct interest.  There is no indication that the Framers had such a sense of the common law.[10]

Upon close examination of the Compact itself and the parties and interests which created it, we cannot conclude that "the nature of the issues involved [in this

---

[10]In discussing the importance of submitting actions between the states to federal jurisdiction, Alexander Hamilton explained that "[n]o man ought to be a judge in his own cause, or in any cause in respect to which he has the least interest or bias."  The Federalist No. 80, at 478 (Alexander Hamilton) (Clinton Rossiter ed. 1961).  And in explaining the reasonableness of excluding juries from admiralty prize cases, which often raised issues touching upon the relations of sovereign states, see 2 George L. Haskins & Herbert A. Johnson, History of the Supreme Court of the United States 437–38 (Paul A. Freund ed., 1981), Hamilton cited both the possibility that a jury would be unable "to pay sufficient regard to those considerations of public policy which ought to guide their enquiries" and the "danger that the rights of other nations might be infringed by their decisions."  The Federalist No. 83, supra, at 504 (Hamilton).

case]," Terry, 494 U.S. at 564 (plurality opinion), is similar to an Eighteenth Century common law contract action. The Compact directly affects the interests of five individual sovereign states and their citizens. It represents a collective effort of these states to create facilities for the disposal of radioactive waste so that it does not endanger their population or environment. In seeking to hold Nebraska to its obligations under the Compact, the Commission acts pursuant to the power delegated to it by the member states to enforce their mutual agreements. While contract principles may inform the interpretation of an interstate compact and the remedies available thereunder, see Texas, 482 U.S. at 128, this action is not like a contract action at common law as heard in the English law courts of the late Eighteenth Century. It is better understood by considering the nature of the interstate Compact and the analogies advanced by the Commission. Cf. Terry, 494 U.S. at 568 (plurality opinion) ("The nature of an action is in large part controlled by the nature of the underlying relationship between the parties.").

The second inquiry in the Seventh Amendment historical test requires examination of "the remedy sought and . . . whether it is legal or equitable in nature." Granfinanciera, 492 U.S. at 42. The Commission originally sought sweeping equitable and declaratory relief designed to obtain a fair process and completion of the license application review, as well as damages for the "lost value" of what it had already paid out. The district court decided after hearing the evidence, however, that injunctive relief was no longer practical and instead granted the Commission's interrelated request for money damages to compensate for the funds lost in the failed licensing process.

Nebraska argues that the historical test must be decided in its favor because damages are "'the traditional form of relief offered in the courts of law,'" Terry, 494 U.S. at 570 (quoting Curtis v. Loether, 415 U.S. 189, 196 (1974)). It points out that "the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action," citing Tull, 481 U.S. at 421.

Nebraska overlooks the fact that the historical test looks to the remedy which was "sought" by the plaintiff, see Granfinanciera, 492 U.S. at 42, and that the major relief sought by the Commission was equitable in nature. Although its prayer for relief also requested damages, that request was intertwined with the other relief requested. The compensatory damages sought were for "all lost value of costs incurred and money therefore paid out by the Commission" in the futile licensing process.[11] If the interrelated request for injunctive relief had been granted at an early stage of the application process, the lost value would have been relatively low. By the end of trial when the district court decided injunctive relief was no longer practical, many years of Nebraska's bad faith tactics had caused the lost value to grow astronomically.

The district court found that the injunctive relief originally sought would have better protected the interests represented by the Commission than its award of compensatory damages for the failed licensing process. One reason was because traditional damages compensate established loss, and the court found that the loss in value to the Commission from Nebraska's failure to perform in good faith "is unknown and incapable of measurement to any reasonable degree of certainty." Entergy Arkansas, Inc., 226 F. Supp. 2d at 1151. Although damages could not "serve as a complete or adequate substitute for Nebraska's breach," id. at 1160, the process had become so badly tainted that it could never be made to operate fairly so the court settled on providing only monetary and declaratory relief. Id. at 1160–61.

The decision on whether a jury trial is required must necessarily be made before trial on the then existing record. In reviewing the district court's decision to try this case without a jury, we must focus on the record as it existed before trial and on the remedies sought by the Commission, rather than the remedy fashioned after

_____

[11]The Commission had also sought "reasonably certain consequential damages" for any further losses continuing into the future, including the cost of finishing the licensing process and developing either the Boyd County site or the next disposal site. The district court did not award any such damages.

-23-

trial. See Granfinanciera, 492 U.S. at 42 (court must examine "remedy *sought*") (emphasis added); Tull, 481 U.S. at 421 (examining "relief *sought*") (emphasis added). The Commission originally requested a sweeping injunction asking for restructuring of the licensing process for the low level radioactive waste disposal facility under the supervision of the court or another entity of the court's choosing. The Commission also sought declaratory relief, an accounting, and compensation for its expenditures and losses incurred during the licensing process as a result of Nebraska's bad faith. Entergy Arkansas, Inc., 226 F. Supp. 2d at 1150. The request for damages was intertwined with the request for injunctive relief in that the Commission's prayer for relief asked for compensatory damages for losses already incurred in the absence of an injunction. Such damages are appropriately awarded by a court of equity when a party has not performed within the time required. See Restatement (Second) of Contracts, § 358 cmt. c (1981).

The relief ultimately awarded by the district court cannot fairly be classified as legal in nature. The Restatement (Second) of Contracts explains that "[a] claimant who sues for specific performance or an injunction and who is denied that relief, may be awarded damages or restitution in the same proceeding." Id. The Supreme Court "has not . . . held that 'any award of monetary relief must *necessarily* be "legal" relief.'" Terry, 494 U.S. at 570 (quoting Curtis, 415 U.S. at 196) (emphasis in original). A "monetary award 'incidental to or intertwined with injunctive relief' may be equitable." Id. at 571 (quoting Tull, 481 U.S. at 424). Damages awarded for losses not fully cured by equitable relief are "exactly the type of monetary relief that courts, and the [Restatement(Second) of Contracts], envision as equitable relief; they are incidental to the grant of equitable relief, yet are necessary to afford complete relief." Golden v. Hersey, 73 F.3d 648, 661 (6th Cir. 1996).

Although the second part of the historical test may in some circumstances outweigh the first in significance, see Tull, 481 U.S. at 421,[12] we believe that in this

---

[12]Unlike the present case, the damages sought in Tull were clearly legal in nature and substantially outweighed the nature of the injunctive relief sought. Tull

case both parts of the test lead to the conclusion that the district court did not err in striking Nebraska's jury demand. An action between sovereigns, as this case is in substance, directly affecting the rights and interests of each of the five party states is far in nature from a typical action at law in the English courts of the late Eighteenth Century.[13] As the Supreme Court noted in Tull, a court in equity may grant monetary relief incidental to or intertwined with injunctive relief, 481 U.S. at 424, and the second part of the test focuses on the relief which was sought by the plaintiff. Id. at 421. Here the Commission sought intertwined equitable and monetary relief.

In sum, we conclude that the district court did not err by striking Nebraska's jury demand. The Commission's action is not analogous to one tried at law in the English courts of the Eighteenth Century. It involves a dispute growing out of an interstate compact, sanctioned by the Constitution and Congress, and entered into by five sovereign states. It is unlike disputes tried to a jury in the Eighteenth Century. The chief remedy sought by the Commission was sweeping injunctive relief to move the application process forward and construct a radioactive waste disposal facility in Nebraska. It was only after the district court had heard all of the evidence that the extent of Nebraska's bad faith was established and a suitable remedy had to be fashioned. When the court found injunctive relief no longer practical, it turned to the Commission's interrelated request for compensatory damages to provide an appropriate remedy. We conclude that the district court did not commit legal error or abuse its discretion in fashioning this monetary relief and that it did not violate the Seventh Amendment by striking Nebraska's demand for a jury trial in the circumstances of this case.

---

involved a $22 million civil penalty under the Clean Water Act; such a punitive remedy would have been available only in a court of law. Here, the court's grant of money damages was not disproportionate to the nature of the powerful injunction sought by the Commission.

[13]It is also interesting to note that the Supreme Court has awarded monetary damages without a jury in original actions between states arising from interstate compacts. See, e.g., Kansas, 533 U.S. at 4-5.

B.

Nebraska also argues that the district court erred by finding that it breached its good faith obligation under the Compact. Whether Nebraska failed to act in good faith is a question of fact, which we review for clear error. See In re Armstrong, 285 F.3d 1092, 1096 (8th Cir. 2002). Conclusions of law are reviewed de novo. Walker v. Maschner, 270 F.3d 573, 576 (8th Cir. 2001).

Because this case arises under federal law and there is no federal common law on the meaning of good faith under an interstate compact, the district court turned to the Restatement (Second) of Contracts for guidance. Neither side has directly challenged the district court's consideration of the Restatement, and we believe that it is an appropriate reference. See Texas, 482 U.S. at 129 (citing the Restatement in interstate compact case).

The Restatement defines good faith in this way:

> honesty in fact in the conduct or transaction concerned. . . . Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

Restatement (Second) of Contracts § 205 cmt. a (internal quotation marks omitted). It discusses bad faith by giving examples:

> [B]ad faith may be overt or may consist of inaction . . . . A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

-26-

Id. § 205 cmt. d.

Nebraska takes the position that the district court should have used an arbitrary and capricious standard of review. To support its contention, Nebraska cites Art. V(g) of the Compact, which provides that the membership of a state in the Compact may be revoked if it is found to have "arbitrarily and capriciously denied or delayed the issuance of a license." It does not follow that the standard for revocation of membership should control other issues under the Compact, for "nothing in the Compact states that [Art. V(g)] . . . is the exclusive enforcement mechanism." Entergy I, 210 F.3d at 897. Indeed, the Compact elsewhere provides that "each party state has the right to rely on the good faith performance of each other party state," Art. III(f), and that the Commission "may initiate any proceedings . . . relating to the terms or provisions of [the] Compact," Art. IV(e). The district court properly focused on whether Nebraska had carried out its Compact obligations in good faith during the licensing process, rather than on conducting a traditional agency review.

Nebraska also argues that giving full effect to the requirement of good faith would impose nonnegotiated limits on its licensing discretion, citing United States v. Basin Elec. Power Co., 248 F.3d 781, 796 (8th Cir. 2001) ("[I]mplied covenant [of good faith] has nothing to do with the enforcement of terms actually negotiated and cannot block [the] use of terms that actually appear in the contract.") (internal quotation marks omitted and alteration in original) and Taylor Equip., Inc. v. John Deere Co., 98 F.3d 1028, 1031–33 (8th Cir. 1996) (similar). These cases are not on point, for there is no issue here of an implied promise of good faith modifying or limiting an otherwise discretionary term in the Compact. Rather, the Commission seeks to enforce the good faith covenant within the Compact, an explicit provision which it was given the authority to enforce and which is separately enforceable. See Entergy I, 210 F.3d at 897. To limit bad faith to arbitrary and capricious behavior would undermine the structure of the multistate agreement. We thus agree with the district court that the question before it was whether a preponderance of the evidence

-27-

proved that the State of Nebraska failed to act in good faith in respect to its obligations under the Compact.

The voluminous record supports the district court's factual findings of bad faith. The district court dedicated almost 40 pages of its published opinion to these findings and to cataloguing the evidence of Nebraska's bad faith. See Entergy Arkansas, Inc., 226 F. Supp. 2d at 1102–40. The district court found that the license was denied for political reasons without regard to the technical merits of the application.

Nebraska had denied the license application in December 1998, giving as reasons "that there was insufficient depth of the water table at the site . . . and that USE had not shown financial ability to build and run the facility." Entergy II, 241 F.3d at 984. The district court found that these reasons were simply pretext, and the evidence supports its finding. Nebraska's final decision was completely at odds with the findings and conclusions in the technical reports it had prepared. Both the IPA and the DSER had concluded that groundwater did not pose a problem that would prevent licensing.

The IPA, a report commissioned by the state, was based on a study conducted by Richard Arnold, a Ph.D. in mechanical engineering. Dr. Arnold used very sophisticated computer and mathematical models to determine whether over a 10,000 year period the facility might expose the public to radiation in excess of regulatory limits. His study employed very conservative assumptions, assuming for example that the land under the concrete base of the facility would be "completely saturated as a result of a high water table." He concluded that the "maximally exposed member of the public will be subject to a Total Combined Total Effective Dose Equivalent of 5.0 mrem." Since the regulatory limit was 25 mrem, the IPA showed that the facility was well within regulatory performance criteria for radiation exposure.

The DSER had also reached favorable conclusions. The DSER was prepared by over 100 technical consultants employed by Nebraska. They had been asked to

provide the "technical review of the license application" in order "to determine if the facility meets applicable State laws and regulations, and if the facility's design, physical features, and safety systems are technically acceptable." Among the analyses underlying the DSER was a special computer study conducted by Dr. Stewart Taylor, a Ph.D. in hydrology from Princeton University. The DSER concluded that "the data, analysis, and information presented in [USE's] license application are acceptable" with respect to "the [facility's] location, natural and demographic features, geologic features, surface and groundwater conditions, and preoperational environmental monitoring." The district court found that the DSER had actually rejected all of the hydrologic grounds upon which Nebraska later relied to deny the license, and Nebraska has not argued that this finding was erroneous.

In spite of these reports and the strong scientific evidence on which they were based, Nebraska adopted a completely contrary position on the effect of groundwater at the site. Nebraska argues there is scientific evidence to support this reversal. It points to a study conducted after the completion of the DSER and IPA by its review manager for site characteristics, Dr. Marvin Carlson. He concluded that groundwater could pose a problem at the site, and the district court examined whether Nebraska's decision to rely on Carlson's conclusion in the face of the strong scientific evidence to the contrary was made in good faith.

The district court found that Carlson's study was not as scientifically persuasive as the earlier research, and the record supports this determination. Carlson himself was a geologist, not a hyrdrologist, and there was evidence that he had not consulted with any of the hydrologists on Nebraska's review team. His report was based only on visual inspection of hydrographs, rather than on any quantitative or statistical analysis. Nebraska counters that Carlson's study incorporated data unavailable to the earlier studies, but the Commission's experts provided evidence that these data were not statistically different from those in the earlier studies. That evidence was not disputed at trial by Nebraska's experts. Also undermining the reliability of Carlson's study was the fact that on June 27, 1998, just one month before he concluded that

groundwater posed a problem, he had submitted an evaluation directly to the contrary in which he indicated that it did not.

Randolph Wood, head of DEQ, testified at trial that his decision to deviate from the DSER and IPA on groundwater issues was based on a simple cross section drawing which showed the building plans and elevations of the land and groundwater at the site. The district court questioned why Wood would rely on such an elementary analysis after Nebraska had required USE to pay for much more complex and sophisticated studies, such as those relied on by the DSER and IPA. It is also of note that Nebraska has not relied on that cross section drawing in its argument that the district court erred in finding that the decision denying USE's application was not made in good faith.

Not only is Nebraska's failure to adopt the conclusions of its own consultants in the DSER and IPA strong evidence of bad faith, there was evidence that the groundwater issue was raised to support a political decision made by Wood in July 1998 or earlier to deny the license.[14] For example, a July 18, 1998 email from one of Nebraska's engineering consultants to other consultants stated that DEQ employees were "trying to figure out how to spin responses, evaluations, and the [final decision documents] . . . so that they would support [Wood's] no go decision. *Their conclusion was that first they must compose the decision document and then find the technical support or lack thereof for the decisions.*" (emphasis added). Barry Butterfield, the environmental review manager, told Wood in a meeting on July 24 that the denial decision was inconsistent with the IPA and was "technically

---

[14]Documents had been prepared by the state as early as 1992 which appeared to anticipate a disposition based on political concerns rather than the technical merits of the license application. One memorandum recommended that the governor order Wood to deny the license on site suitability grounds even if he thought it was suitable since an appeal of his decision would be "strictly an administrative appeal on the record. . . . [so the] [w]orse case scenario if the court finds against the state, is that the Court will order the state to finish the license review."

unsupportable." Butterfield later testified that Wood had replied, "this decision is not about health and safety, it's about regulatory interpretation." Based on this and other evidence in the record, we conclude that the district court did not err in finding that "the 1998 decision to deny the license ostensibly because of concerns about water was pretextual, unreasonable, and unfair." Entergy Arkansas, Inc., 226 F. Supp. 2d at 1138.

The record also supports the district court's finding that the decision to deny the license based on USE's financial condition was not made in good faith. There was evidence that Nebraska attempted to manipulate the review of USE's financial condition so as to support a decision denying the license. The state's regular financial reviewers[15] had all concluded that USE had provided sufficient written financial assurances, and they had recommended that the state issue the license, conditioned on USE's acquisition of adequate financing within 120 days. One of the review managers reported to his superiors that conditional licenses were standard practice in the construction world and "once you had a license in hand . . . people would be standing in line to finance it because of the nature of the business, being a Compact site as well as some form of a monopoly business." In addition, the DSER issued in October 1997 concluded that USE "has demonstrated that it meets the financial criteria established by the State of Nebraska."

Despite the favorable conclusions about USE's financial ability reached by the state's own reviewers and the DSER,[16] Wood decided to hire a brokerage and investment firm for a further review. The firm had been recommended by a friend of the governor, and Wood substantially limited the scope of its analysis. It was

---

[15]The state reviewers included a CPA, an attorney from the law firm consulting on the licensing process, and an environmental engineer with an advanced business degree.

[16]Nebraska argues that the DSER was not legally binding on the agency decisionmakers and that its conclusions were not evidence of bad faith. The issue is not whether the decisionmakers could reach a decision different from the DSER, however, but whether they did so in good faith.

instructed to ignore many common sources of financing, including financing from the Generators.[17] The analysis made no effort to capitalize the facility's anticipated future income stream, even though USE was guaranteed a 20% rate of return under the Compact and its contract with the Commission, and even though it would have had a virtual monopoly for the five state area. The firm's final report asserted that "the Company still does not appear to have the ability to finance a major project such as the low-level radioactive waste disposal site . . . without major assistance and/or guarantees from the largest members of the . . . Compact." Based on this limited report, Nebraska's final decision document concluded that USE and its parent company were not financially qualified to build the disposal facility.

After examining such evidence in the record, we conclude that the district court did not err in finding that "the 1998 decision predicated upon a lack of financial assurance was pretextual and covered up the real and bad faith reason that drove the decision."

The district court's finding that the decision to deny the license was based on political rather than technical considerations was also supported by extensive evidence stretching back to the very beginning of the Nelson administration that suggests it was biased against the disposal facility and intended to undermine it.[18]

---

[17]The financial analyst who prepared the report primarily studied the income statements and balance sheets of USE's parent company. He testified that his "focus was not to determine where they could find the money, but instead, if they had a balance sheet and the operational history to support financing the project." He did not contact possible third party sources of funding, including banks, insurance companies, or investors. He also testified that he had understood the scope of his work to exclude consideration of possible financing by the Commission or the Generators.

[18]The state argues that the district court should not have admitted evidence of bad faith executive conduct that occurred prior to 1993 because the case was not filed until 1998 and a five year statute of limitations was applied. Federal law determines the accrual date of a federal claim, see Union Pac. R.R. Co. v. Beckham, 138 F.3d 325, 330 (8th Cir. 1998), however, and under federal common

The governor had campaigned on a pledge to block construction of the disposal facility, and an inference of bias against the facility may be drawn from his early hiring decisions for several important positions related to the disposal facility. The governor hired Kate Allen, a known site opponent, to be his chief LLRW policy advisor, and a high ranking state official testified that she was "very biased on the issue [of the disposal facility]." After the governor indicated that it was "important to get [a] director [without] an agenda who we can trust" to head the DEQ, a friend recommended Randolph Wood. Wood was hired even though he had informed the administration that his philosophy was to "make no effort whatsoever to work with an applicant to work out a way to use a piece of property that would be suitable." There was also evidence that the governor's office informed Wood of "where the governor is going on [the disposal facility] and what expectations for [Wood] will be."

The record shows that the administration began to develop and implement a plan to undermine the licensing process. Shortly before the governor took office, Allen prepared an "Action Plan on [Low Level Radioactive Waste]." The first item in the plan stated that "Upon taking office [the Governor] will order a moratorium on further development of the facility . . . ." Allen's notes from meetings with the

---

law "'there is no accrual [of a cause of action] until all facts exist so that the plaintiff can allege a complete cause of action.'" Gustafson v. Cornelius Co., 724 F.2d 75, 79 n.9 (quoting Butler v. Local Union 823, Int'l Bhd. Teamsters, 514 F.2d 442, 450 (8th Cir. 1975) (per curiam), overruled on other grounds by United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56 (1981)). Here, the final denial of the license did not occur until December 1998. There was in any event more than enough evidence after 1993 to support the court's bad faith finding, and earlier actions would have been admissible as background.

Since the Commission's claim did not accrue until 1998, Nebraska's argument that the district court should have applied a two year statute of limitations need not be discussed, particularly since there was sufficient supporting evidence within that two year period (including the final denial of the application).

governor show him formulating ideas to prevent construction of the facility. Her notes reflect the governor saying: "[we must] create[] noise & difficulties[;] think we can win it; expensive"; "[o]ur best bet is to be the under dog who has been taken advantage of by the bad power companies"'; and "[I] want [USE] to think that [I am] deranged."

In her position as chief LLRW policy advisor, Allen continued to act as she had in her former role of outside site opponent. At one point she sent sensitive internal documents describing the DEQ's legal analysis of the viability of the site to an attorney representing a group opposing the facility. There was also evidence showing that Allen tried to influence DEQ and DOH technical staff working on the license application. Allen attended nonpublic DEQ and DOH meetings and asked questions of review managers and even offered opinions on technical issues. The review managers were upset by this interference and complained, and the LLRW Program manager for DEQ testified at trial that Allen's participation in these meetings was improper.

The plan to undermine the disposal facility was evidenced by the support and encouragement the administration gave Allen, even though it knew that her negative activities could be problematic. In an email to senior administration officials, including the chief of staff and the governor's legal counsel, Allen acknowledged that she knew of the possibility of "a 'bad faith' case against Nebraska." She was therefore "being very careful in what I say." Instead of causing concern, Allen's actions received support and praise from the administration. Allen's supervisor, for example, sent her an email stating that he had "a good chat with the Governor." "First and foremost," the email continued, "you still have the Governor's . . . unequivocal support. The governor commented that you are bearing the brunt of the Compact's [sic] disgust with him (and with your ability to 'blow their skirts up.'). . . . Bottom line: Everybody here still loves ya, kid." Moreover, even though Allen was fired in late 1992—for becoming a "legal liability" for the governor her notes report—the evidence shows that members of his administration conferred with her at least 50 times after her firing while she was working as a part time lawyer for site opponents.

There was also evidence that a further element of the plan to undermine the project was to use litigation as a weapon against the Commission.[19] Allen's notes show that the governor told site opponents, "Let's talk about litigation [without] giving our plan to the other side—We want to keep them off balance." He added, according to Allen, "[l]itigation, will continue to look at every angle."

Nebraska filed six cases against the Commission during the period 1993 to 1997, losing five and settling the other. Several of these suits were duplicative, and a similar action brought by Boyd County—represented by counsel for a group of site opponents (the Local Monitoring Committee or LMC)—caused the district court to express concern that the state was conducting "hit-and-run guerilla warfare by filing multiple lawsuits on the same claim in order to frustrate performance of the Compact."[20] County of Boyd v. U.S. Ecology, 858 F. Supp. 960, 974 (D. Neb. 1994). In affirming the district court, Judge Wollman characterized the case as "just the latest in a series of actions attempting to block the [facility]." County of Boyd v. U.S. Ecology, 48 F.3d 359, 360 (8th Cir. 1995). In a later action by Nebraska contending that the Commission lacked the power to set a deadline, Judge Urbom found that the state had declined even to attend a meeting to discuss a deadline and had failed to provide answers to specific questions asked by the Commission about its progress in processing the license application. See Nebraska v. Central Interstate Low-Level Radioactive Waste Commission, No. 4:96CV3438 (D. Neb. Oct. 15, 1998). In

---

[19]Nebraska argues that the Noerr-Pennington doctrine prohibits consideration of lawsuits as evidence of bad faith because they are protected by the First Amendment, citing Razorback Ready Mix Concrete Co. v. Waever, 761 F.2d 484, 486 (8th Cir. 1985). Nebraska has not cited any authority which would extend the Noerr-Pennington doctrine from antitrust law to this type of action. Nebraska also makes several other evidentiary arguments which we have carefully considered and find without merit or dispositive impact.

[20]There was evidence that showed that the administration viewed the LMC as a useful cover for its own agenda. For example, Kate Allen reminded her superiors that the "LMC can still be used by the Governor to do things he cannot do directly."

affirming the district court, Judge Beam observed that the state's argument was contrary to the "plain language" of the Compact. Nebraska, 187 F.3d at 987 (8th Cir. 1999). Another suit brought by Nebraska claimed, in spite of clear Compact language to the contrary, that the state had a right to seat two voting members and one nonvoting member on the Commission. See Nebraska ex rel. Nelson v. Central Interstate Low-Level Radioactive Waste Comm'n, 902 F. Supp. 1046 (D. Neb. 1995). That action was dismissed, and no appeal was taken.

The evidence of Nebraska's continuing efforts to thwart and delay the facility strongly supports the district court's finding that USE was denied a license without regard to the technical merits of its application. Indeed, the evidence shows that Nebraska was prepared to do whatever was necessary to avoid hosting an LLRW disposal facility—even if that meant ignoring its own consultants and denying the license on pretextual grounds.

For the reasons discussed and based upon review of the entire record, we conclude that the district court did not clearly err in finding that Nebraska ultimately denied the license application for reasons not related to the merits of the application. Such a denial in the context of Nebraska's commitments in the Compact is the essence of bad faith, a calculated "evasion of the spirit of the bargain." Restatement (Second) of Contracts § 205 cmt. d. Throughout the course of the licensing process, Nebraska exhibited a lack of diligence or cooperative effort and willfully rendered imperfect performance. See id. We conclude that the district court did not err by finding that Nebraska breached the duty of good faith imposed by the Compact.[21]

---

[21]The state argues that the district court failed to accord its decisionmakers a presumption of both past and future honesty and impartiality as required by Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Assoc., 426 U.S. 482, 497 (1976); Withrow v. Larkin, 421 U.S. 35, 47 (1975); Gordon v. Hansen, 168 F.3d 1109, 1114 (8th Cir. 1999); and Ikpeazu v. Univ. of Neb., 775 F.2d 250, 254 (8th Cir. 1985). Even assuming that such a presumption extends beyond the issues of procedural due process raised in those cases, the record here contains more than enough evidence of bias to rebut it, even considering the turnover in state

-36-

## C.

Nebraska also challenges the monetary relief awarded by the district court. It first argues that even if the district court was correct that it acted in bad faith, the court erred by awarding damages. It contends that the proper remedy for a flawed administrative decision is a remand to the agency with instructions to correct the flaw. Whether a particular remedy is available and appropriate is a question of law which we review de novo. Cummings v. Connell, 316 F.3d 886, 893 (9th Cir. 2003).

The gravamen of the Commission's suit is Nebraska's breach of the duty of good faith imposed by this interstate Compact, rather than a challenge to a particular agency action. Nebraska has not shown that any provision of the Compact limits the remedies for breach to a remand or that our earlier ruling, that the Commission had the right to sue for damages under the Compact, is wrong.[22] Entergy II, 241 F.3d at 988; see also Kansas, 533 U.S. at 7 (awarding monetary relief for violations of interstate compact). The district court did not err by declining to remand for further action by the state agencies which administered the licensing process.[23]

---

personnel.

[22]In an earlier decision we rejected Nebraska's argument that the Commission may not recover for its losses because it is not a party to the Compact. See Entergy II, 241 F.3d at 988. The Commission was explicitly empowered by the Compact to "initiate any proceedings . . . before any court of law" in order to carry out its delegated duty to enforce the obligations imposed by the Compact on the party states. Art. IV(e), (m)(8). To prevent the Commission from seeking such relief would gravely undermine its ability to carry out its enforcement duties.

[23]Nebraska also renews its argument that it did not waive its sovereign immunity to monetary relief, but that issue was resolved against it earlier in this case based on its commitments in the Compact. See Entergy II, 241 F.3d at 987 (affirming district court's ruling that waiver of sovereign immunity extended to suits for money damages).

An additional point raised by Nebraska is whether the court properly awarded monetary relief in lieu of enjoining it to act in good faith. Nebraska argues that the district court's failure to order the Commission to continue the licensing process is contrary to "the well-established rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," Angela R. ex rel. Hasselbein v. Clinton, 999 F.2d 320, 326 (8th Cir. 1993). We review a decision not to impose a particular equitable remedy for an abuse of discretion. See Thorson v. Gemini, Inc., 205 F.3d 370, 385 (8th Cir. 2000).

The record reveals that the district court considered, but ultimately rejected injunctive relief. It found that the state agencies had demonstrated an inability to review the license application fairly and that Nebraska's withdrawal from the Compact made it unlikely an injunction could be effectively enforced. Earlier, in affirming the preliminary injunction halting the second contested case proceeding, we referred to evidence "that Nebraska did not provide, or intend to provide, impartial consideration of [the license application] . . . . [and that] Nebraska has used its administrative process wrongfully to delay and deny the license." Entergy I, 210 F.3d at 899. Because of this record "the deference generally due a state's administrative proceeding does not apply." Id.; cf. Coit Independence Joint Venture v. L. Ins. Corp., 489 U.S. 561, 587 (1989) ("Administrative remedies that are inadequate need not be exhausted."). Nebraska had over ten years before this case was even filed to comply with the Compact, and it has not shown that its licensing proceedings would be any fairer now were it given more time. Given the record of Nebraska's bad faith and antagonism to the disposal facility since the state was chosen as the first site, the district court did not abuse its discretion by awarding monetary relief when injunctive relief was no longer feasible.[24] See Lemon v. Kurtzman, 411 U.S. 192, 200 (1973)

---

[24]The cases cited by Nebraska in support of its argument that comity requires another opportunity to process the license application differ from the situation here. Some turn on whether an injunction overreached or excessively limited the discretion of state officials, rather than on whether monetary relief was appropriate in lieu of an injunction. See, e.g., Board of Regents of Univ. of Wisc. v. Southworth, 529 U.S. 217 (2000); Missouri v. Jenkins, 515 U.S. 70, 85–86

(plurality opinion) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and *what is workable*.") (emphasis added).

Nebraska next argues that even if damages were a permissible form of relief, the Commission suffered no losses on which such a remedy could be based because it sought to recover for funds received from the Generators and for USE's work. It asserts that the Commission was at best the mere trustee of assets belonging to others and that neither it nor the member states suffered any compensable harm.

The record reveals that the funds from the Generators, the credits for USE's work on the licensing process, and the funds from the nonhost states all became assets of the Commission. The Commission's accountant testified that the expenditures on which the district court's monetary relief was based were made with Commission funds paid from its own accounts. The Commission acquired most of these funds as part of negotiated exchanges for valuable rights it controlled. It obtained funds from the Generators in exchange for future disposal services and work from USE in exchange for allowing it to develop and operate the site. It also collected $3 million from the other Compact states to distribute as community improvement grants in

---

(1995); Knox v. Salinas, 193 F.3d 123, 129–30 (2d Cir. 1999); Southworth v. Grebe, 151 F.3d 717, 734 (7th Cir. 1998), rev'd on other grounds, Schwartz v. Dolan, 86 F.3d 315, 319 (2d Cir. 1996); Clarke v. Coye, 60 F.3d 600, 604 (9th Cir. 1995); Schuldt v. Mankato Indep. Sch. Dist. No. 77, 937 F.2d 1357, 1360 (8th Cir. 1992).

Others simply illustrate that in some situations it is appropriate to allow agency proceedings to continue. See Yamaha Motor Corp. U.S.A. v. Stroud, 179 F.3d 598, 602 (8th Cir. 1999); Melendez v. U.S. Dep't of Justice, 926 F.2d 211, 219 (2d Cir. 1991); Jen Hung Ng v. INS, 804 F.2d 534, 539 (9th Cir. 1995). We do not disagree with this principle, but the facts of this case call for a different remedy.

In First Nat'l Bank of Albuquerque v. Albright, 208 U.S. 548, 553 (1908), there were no findings of bias or bad faith, but only a fear that an officer would "perform [his statutory duty] wrongly."

Boyd County. Whether any of these other entities seek adjustments in their accounts in the future is not at issue here.

The issue is whether the district court erred by requiring Nebraska to reimburse the Commission for the costs of a license application process made futile by the state's bad faith. At an earlier stage we held that the Commission could seek to recover for the funds and work expended in pursuit of the license, see Entergy II, 241 F.3d at 988, and the more complete record now before us further supports that conclusion. The district court did not clearly err in calculating the Commission's losses.

Finally, Nebraska argues that the district court overstated the Commission's losses by not reducing its award to account for the residual value of the license application. The district court specifically found that the entire value of the expended funds and effort had been wasted, but the state contends that the Commission, USE, and the Generators received some value from the process. That value is said by Nebraska to be a completed application. Given that the evidence supports the district court's finding that the licensing process is irremediably broken and that Nebraska has suggested no use for the application outside of this review process, the district court did not clearly err in holding that the Commission received no value from the licensing process.[25]

_____

[25]Nebraska also argues that the district court did not properly confine its award to protecting traditional interests, such as expectation or reliance interests. We note that the Restatement makes clear that "in situations in which a court grants such relief as justice requires, the relief may not correspond precisely to any of these interests." Restatement (Second) of Contracts § 344 cmt. a. The traditional interests "are not inflexible limits on relief." Id. In this case, the district court concluded that the Commission's expectation interest was incalculable and therefore sought to protect its reliance interest. By compensating the Commission for its expenditures, the district court placed it "in as good a position as [it] would have been in had the [Nebraska site venture] not been [undertaken]." Id. § 344(b) (describing reliance damages).

D.

Nebraska contends that the district court also erred by awarding interest. It argues that it enjoys sovereign immunity from interest and that only a specific waiver is effective in respect to interest, citing Library of Cong. v. Shaw, 478 U.S. 310, 314–15 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."). Whether a state has waived its sovereign immunity is a question of law which we review de novo. See Entergy II, 241 F.3d at 987.

We have previously declined to extend Shaw to a question of state sovereign immunity. In Jenkins v. Missouri, we noted that Shaw involved a suit against the federal government and was therefore not controlling "in a case involving eleventh amendment, rather than federal sovereign immunity." 838 F.2d 260, 265 (8th Cir. 1988) (affirming enhanced award of attorney fees to account for delay in payment). The Supreme Court later affirmed our court on the Eleventh Amendment issue, and it also expressly limited Shaw to the issue of federal immunity. The Court saw no "equivalent rule relating to state immunity that embodies the same ultrastrict rule of construction for interest awards that has grown up around the federal no-interest rule." Missouri v. Jenkins, 491 U.S. 274, 281 n.3 (1989); see also Reopell v. Massachusetts, 936 F.2d 12, 15 (1st Cir. 1991) (noting the Court's limitation of Shaw in Jenkins); Pegues v. Mississippi State Employment Serv., 899 F.2d 1449, 1454 & nn.29–30 (5th Cir. 1990) (same). We agree with the First Circuit's conclusion in Reopell that if a state's sovereign immunity does not bar the underlying monetary award, it will not bar an award of interest. Reopell, 936 F.2d at 15. Because Nebraska has waived its immunity from an award of damages, it also has no immunity from the assessment of interest.

Nebraska also argues that even if it has no constitutional immunity to an interest award, an award of prejudgment interest was not legally permissible in this case. Whether a particular remedy is available is a question of law which we review

-41-

de novo. Cummings, 316 F.3d at 893. The state contends that prejudgment interest may not be awarded since it was not specifically authorized by the Compact.

A district court may award prejudgment interest if "federal law authorizes [such] awards . . . [in the relevant action]," Monessen Southwestern R.R. Co. v. Morgan, 486 U.S. 330, 336 (1988), and federal common law clearly permits prejudgment interest to be awarded as a part of the remedy for breach of an interstate compact. For example, in Kansas, the Supreme Court awarded Kansas prejudgment interest over Colorado's objection even though the compact in question was silent on the issue of remedies. 533 U.S. at 9–12; id. at 24 (O'Connor, J., dissenting) (noting Compact's silence on remedies).

Nebraska also argues that the district court should have applied a Nebraska statute that prohibits imposition of prejudgment interest on the state. See Neb. Rev. Stat. § 45-103.04. This argument overlooks the rule that "whether interest is to be allowed . . . is a question of federal law where the cause of action arises from a federal statute." Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1330 (8th Cir. 1995); see also Morgan, 486 U.S. at 335 ("Pennsylvania courts erred in treating the availability of prejudgment interest in FELA actions as a matter of state law rather than federal law."). While it is true that the Supreme Court considered state law in Board of Comm'rs of Jackson County v. United States, 308 U.S. 343 (1939), a case about whether interest was due an Indian taxed in violation of federal law, the Court specifically held that state law did not control the issue. See id. at 350-51 ("[T]he federal courts [are not] restricted to the remedies available in state courts in enforcing such federal rights."). The Court nevertheless "absorbed" the state law on interest as the governing federal rule in deference to "considerations of fairness." Id. at 351-52. Nebraska has not shown that fairness considerations require application of its interest statute in the circumstances of this case, however. We conclude that the district court did not err by not applying the state prejudgment interest statute. Cf. Kansas, 533 U.S. at 9–12 (awarding prejudgment interest without reference to state law).

Nebraska also takes issue with the amount of prejudgment interest awarded by

the district court. Interest was awarded on Commission payments starting in 1987, but Nebraska argues that it should only have been calculated from the point at which the Commission's claim accrued for statute of limitations purposes, which the district court held to be 1998. A decision granting prejudgment interest is reviewed for abuse of discretion. Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1194 (8th Cir. 2000).

Nebraska cites cases such as West Virginia v. United States, 479 U.S. 305, 311 n.2 (1987),[26] which have calculated prejudgment interest from the date of claim accrual "for the loss of use of money," and contends that this is the rule that should be followed here. Other decisions have considered "the equities" to set the starting date. See, e.g., Kansas, 533 U.S. at 14; NYSA-ILA Med. & Clinical Servs. Fund v. Salco Trucking Corp., No. 90 Civ. 5949, 1995 WL 404863, at *1-2 (S.D.N.Y. July 6, 1995) (claim accrual date "has no bearing on setting the appropriate date of accrual of pre-judgment interest"). It makes sense to us that courts have not agreed on a bright line rule because the "essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated." Milwaukee v. Cement Div., Nat'l Gypsum Corp., 515 U.S. 189, 195 & n.7 (1995).

Since the goal of prejudgment interest is full compensation, the approach used in West Virginia to fashion an award is not appropriate here because the circumstances are very different. In West Virginia, the United States sued the state to collect a contractual debt, 479 U.S. at 306, and it was awarded a judgment for the full amount of the debt, plus prejudgment interest as of the date it had billed the state, rather than the date it had performed the services. Id. at 307, 313, aff'g United States v. West Virginia, 765 F.2d 1028, 1030 (4th Cir. 1985) (establishing accrual date of prejudgment interest). This award put the United States in the same position it would

---

[26]Nebraska also cites Reyes-Mata v. IBP, Inc., 299 F.3d 504 (5th Cir. 2002), and Castrignano v. E.R. Squibb & Sons, Inc., 900 F.2d 455 (1st Cir. 1990), in support of its position, but those cases are not on point since they arose under state law and involved state prejudgment interest statutes.

have been in if West Virginia had fulfilled its obligations, see Restatement (Second) of Contracts § 347 (describing expectation interest), for it received the amount the state had contracted to pay, plus compensation for the loss of the use of its money during the time it was wrongfully withheld. Awarding prejudgment interest dating back to the first performance by the United States would have overcompensated it because West Virginia's debt was not due until the date of billing. In other words, the United States' expectation interest was only to be paid on the contract date.

Here, the Commission made periodic payments in furtherance of the licensing process beginning in 1987, and the evidence supports the district court's finding that the entire value of these funds was wasted by Nebraska's breach. Full compensation requires not just an award of the principal value of the funds, but also compensation for the Commission's loss of their use. The court tried to put the Commission in the position it would have been in had Nebraska not been selected to host the radioactive waste disposal facility, for the Commission would never have given up the funds or work credits in question without relying on Nebraska's performance. Full protection of the Commission's reliance interest requires that it be compensated for the entire period that it was without the use of its funds. See id. § 344(b) ("[Reliance interest] is [the promissee's] interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."). Awarding prejudgment interest from the date the Commission made payments in reliance on Nebraska's performance achieves the goal of full compensation. We conclude that the district court did not abuse its discretion in its award.

III.

After lengthy proceedings in the district court and multiple appeals before different panels of this court, the issues have been fully presented. We have carefully examined the extensive record and the arguments of the parties, and for the reasons cited we conclude that the district court did not err in striking Nebraska's demand for a jury trial, in finding that Nebraska breached its good faith obligation under the

-44-

Compact, in exercising its discretion in fashioning monetary relief instead of an injunction, in its awards of damages and interest, or in any other respect relevant to this appeal. The judgment of the district court is therefore affirmed.

_____